**CALIFORNIA ENERGY RESOURCES CONSERVATION AND DEVELOPMENT COMMISSION, Petitioner,**

v.

**BONNEVILLE POWER ADMINISTRATION, Respondent.**

No. 83–7181.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 3, 1984.

Submission Withdrawn July 11, 1984.

Resubmitted Oct. 2, 1984.

Decided March 4, 1985.

William M. Chamberlain, Sacramento, Cal., for petitioner.

Kurt Casad, Portland, Or., for respondent.

Before KILKENNY, SNEED, and NORRIS, Circuit Judges.

Sneed, Circuit Judge:

Petitioner California Energy Resources Conservation and Development Commission (CEC) challenges transactions between the Bonneville Power Administration (BPA) and two northwest electric utilities that took place in 1983. Petitioner seeks a declaratory judgment that the transactions constituted a sale of electric power by BPA at a rate below that authorized by the established rate structure, and that BPA was therefore required to undertake statutorily-mandated ratemaking proceedings before entering into the transactions.

We find that, under the circumstances of this case, BPA was not required to follow ratemaking procedures. We therefore deny petitioner's request for a declaratory judgment.

## I.

## STATEMENT OF THE CASE

### A. *Background*

Respondent BPA is a federal government agency that markets power from hydroelectric projects and other federally-owned sources of electric power in the Pacific Northwest. BPA's operations are governed by the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839—839h (1982) (the Regional Act). The Regional Act requires BPA to set rates that cover its costs and also return the federal investment in BPA's facilities "over a reasonable period of years," *Id.* § 839e(a)(1). The Act prescribes procedures for setting and modifying rates. The procedures include notice in the Federal Register, hearings, and decision on the record. *See id.* § 839e(i). Rates must be approved by the Federal Energy Regulatory Commission (FERC) before they become effective. *Id.* § 839e(a)(2). Rate determinations and other final agency actions are subject to judicial review in this court. *See id.* § 839f(e).

Petitioner CEC is an agency of the State of California responsible for formulation and implementation of energy policies. *See* Cal.Pub.Res.Code §§ 25200, 25216. CEC is interested in BPA rates and the availability of BPA power because California electric utilities purchase a substantial amount of power from BPA.

This case, like the accompanying case of *Portland General Electric Co. v. Johnson,* 754 F.2d 1475 (9th Cir.1985), arises from the BPA's efforts to market surplus electric power during a period of unexpectedly high supply and unexpectedly low demand. *Portland General Electric* contains a more detailed explanation of the surrounding circumstances. Briefly, at the beginning of 1983, BPA found itself with a large surplus of marketable electric power and a severe shortfall in revenues. Abnormally high stream flows were filling BPA's reservoirs to capacity, but sales were off due to a downturn in the national and regional economies. If BPA could not find ways of increasing its sales, it faced the prospect of spilling water over its dams without utilizing the energy that that water could produce, while having to defer interest and amortization payments to the United States Treasury.

The Trojan nuclear power plant (Trojan) is jointly owned by BPA, the Portland General Electric Company (PGE), and the Pacific Power & Light Company (PP & L). BPA owns 30 percent of the plant, PGE

owns 67.5 percent, and PP & L owns 2.5 percent. Trojan produces electric power at an average variable cost of approximately 0.6 cents per kilowatt-hour.

## B. *The Challenged Transactions*

With BPA's reservoirs projected to soon be in a "spill" condition, its marginal cost for producing hydroelectric power in 1983 was much lower than the 0.6 cents per kilowatt-hour that it cost to run Trojan. Additional hydroelectric power was virtually free; it represented the utilization of energy that would otherwise be lost. Therefore, simple economics mandated that Trojan be shut down and the power that it produced be replaced with hydroelectric power from BPA. Such a shutdown and replacement would generate savings for all of Trojan's owners, as well as additional revenues for BPA.

Significant cost savings could only be achieved if Trojan were shut down completely. Simply reducing its output would not produce savings proportional to the reduction. Therefore, for the savings to be achieved, PGE and PP & L, as well as BPA, would have to replace their power from Trojan with hydroelectric power from BPA's dams.

For BPA, replacing its 30 percent share of the Trojan output with hydroelectric power was a purely internal matter, but for PGE and PP & L the replacement required a purchase of power from BPA at BPA's rates. BPA's rate schedule then in effect, however, did not reflect its extremely low marginal cost of producing power under spill conditions. Although the schedule contained a rate that applied specifically to short-term sales under spill conditions, that rate was 0.9 cents per kilowatt-hour, greater than the cost of running Trojan. At that rate, PGE and PP & L would obviously be unwilling to replace Trojan's output with BPA power. The shutdown could therefore be arranged only if the cost of BPA power to PGE and PP & L could be reduced.

BPA met this problem by arranging to purchase from PGE and PP & L their "scheduling rights" to Trojan for the period January 21–April 30, 1983. The purchase of the scheduling rights enabled BPA to shut down Trojan, thereby requiring PGE and PP & L to purchase power from BPA. The purchase price for the scheduling rights was set at 13.1 million dollars. The cost to PGE and PP & L of replacement power from BPA at 0.9 cents per kilowatt-hour was 15.5 million dollars. Therefore, the net cost to PGE and PP & L was only 2.4 million dollars, or approximately fifteen percent of the nominal 15.5 million-dollar cost of replacement power. Thus, the average net price for the replacement power was approximately 0.14 cents per kilowatt-hour (fifteen percent of the nominal 0.9-cent rate), compared to the 0.6-cent cost of running Trojan. At that rate, PGE and PP & L saved money from the Trojan shutdown, but BPA still profitted from the transactions because its cost of generating the replacement power was near zero.

During the shutdown, BPA initiated procedures for the formulation of new rates. *See* 48 Fed.Reg. 4027 (1983); 48 Fed.Reg. 12,777 (1983). The proposed new rates included a special "nuclear displacement" rate of 0.3 cents per kilowatt-hour, applicable to situations such as that that led to the challenged transactions. *See* Bonneville Power Administration, U.S. Dept. of Energy, Administrator's Record of Decision, 1983 Final Rate Proposal, at D–45 (Sept. 1983). The nuclear displacement rate was designed to make ad hoc arrangements such as BPA's purchase of Trojan scheduling rights unnecessary, but, because of the lengthy ratemaking process, the new rates were not scheduled to go into effect until November 1, 1983, six months after the end of the Trojan shutdown.

## C. *CEC's Objections*

CEC objects to the transactions relating to the Trojan shutdown on the grounds that they constituted a modification of BPA's rate structure without adherence to ratemaking procedures mandated by the Regional Act. As already mentioned, CEC

seeks a declaratory judgment that the transactions are unlawful.

BPA responds that the case is moot, that CEC lacks standing to bring this action, and that, on the merits, the transactions were lawful because the replacement power was sold to PGE and PP & L at the established 0.9-cent rate, and BPA's purchase of the Trojan scheduling rights was within BPA's contracting authority under the Regional Act. We shall address each of these contentions in turn.

## II.

## DISCUSSION

### A. *Mootness*

■ BPA argues that this case is moot because the challenged contracts have all been performed and terminated. We disagree, and we hold that this case is not moot, because the challenged transaction is of a type that is "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). As demonstrated by *Portland General Electric*, short-term transactions such as these before us can evade review in the sense that they can be completed in a shorter time than that required by the parties and this court to file, brief, argue, and decide a case. That is all that the concept "ability to evade review" signifies. It does not signify an ability to evade review indefinitely. To find that an issue is "capable of repetition yet evading review" embodies the conclusion that review, albeit somewhat belated, is now possible. That precisely is our conclusion in this case.

BPA also argues that the transactions that gave rise to this action will not be repeated because the "nuclear displacement" rate will make them unnecessary. We agree with CEC, however, that BPA characterizes too narrowly the type of action concerned. As this court stated in *Williams v. Alioto*, 549 F.2d 136 (9th Cir.

1977), "[t]he repetition/evasion exception does not require a repetition of the exact law or behavior. The focus is on whether the same issues, arising from a repetition of a similar law or action, are likely to recur." *Id.* at 143 n. 8. Although the nuclear displacement rate may solve the problem of facilitating nuclear reactor shutdowns, it will not eliminate the incentive for other short-term special arrangements designed to market surplus power at reduced prices in times of slack demand. Any such short term arrangements will raise the same issues raised in this case, and all such arrangements will tend to evade review because of their short-term nature. We therefore find that this case is not moot because it is "capable of repetition, yet evading review."

### B. *Standing*

BPA's challenge to CEC's standing to bring this action also fails.

■ CEC, as an agency responsible for energy planning in a state that purchases substantial amounts of energy from BPA, clearly represents interests that are affected by BPA's rate structure. For this reason, CEC was permitted to participate in BPA's 1982 and 1983 ratemaking proceedings as "a party representing a significant and otherwise unrepresented interest." *See* BPA regulations § 1010.2(f)(2), 47 Fed. Reg. 6240, 6243 (1982). CEC alleges that BPA has modified its rates without adherence to the statutorily-mandated ratemaking procedures. We must accept this allegation as true for the threshold purpose of determining whether CEC has standing. Because CEC has a legally cognizable interest in participating in BPA's ratemaking procedures, then clearly it must have standing to challenge any alleged departures from those procedures that impinges on its interests. Without a right to challenge an alleged failure to follow required procedures, the right to participate in such procedures could be rendered meaningless.

We therefore reject the contention that CEC has no standing to bring this action.

## C. *The Merits*

■ Both CEC and BPA address the merits of this case as a question of the appropriate characterization of BPA's actions. CEC sees these actions as a single transaction. It alleges that BPA sold energy to PGE and PP & L at 0.15 cents per kilowatt-hour, a rate unauthorized by the existing rate schedule and therefore unlawful unless established in new ratemaking proceedings. BPA responds that it engaged in two separate transactions: (1) a purchase of scheduling rights to the Trojan reactor, and (2) a sale of energy at the established spill rate of 0.9 cents per kilowatt-hour. Although we believe that CEC's characterization is nearer the mark, we find that, under the unusual circumstances of this case, BPA was not required to follow ratemaking procedures.

We find BPA's characterization less persuasive because the purchase of Trojan scheduling rights was inextricably linked to the sale of energy to PGE and PP & L. The rights to Trojan power were, by themselves, virtually worthless to BPA. Indeed, the entire set of transactions was motivated by the circumstance that BPA already had more power than it could sell. BPA does not, and could not, contend that those rights themselves were worth the thirteen million dollars that BPA paid for them. In exchange for BPA's thirteen million dollar payment to PGE and PP & L, BPA obtained PGE and PP & L's commitment to purchase fifteen million dollars worth of energy from BPA. In other words, BPA paid PGE and PP & L to purchase power from it. But paying the buyer to buy is the same thing as reducing the price the buyer must pay. We therefore accept CEC's characterization of the transaction as a sale of energy at a reduced rate that ordinarily would require modification of the rate schedule through the statutory ratemaking procedures.

This conclusion is not dispositive of the case, however. As in *Portland General Electric*, we find that the unusual circumstances of this case justified BPA's short-term departure from normal ratemaking procedures. Those circumstances required BPA "to mold its procedures to the exigencies of the particular case." *Gulf States Utilities Co. v. Federal Power Comm'n*, 411 U.S. 747, 762, 93 S.Ct. 1870, 1879, 36 L.Ed.2d 635 (1973). As in *Portland General Electric*, we are influenced by the extraordinary conditions that led BPA to act, by the need for prompt action by BPA, by the short-term, interim nature of the transactions, and especially by the fact that the transactions were voluntary on the part of the participants and had no adverse effect on any of BPA's customers.[1] Had not BPA arranged with PGE and PP & L to shut down the Trojan reactor, that reactor would have burned costly nuclear fuel at the same time that BPA, by spilling water over its dams, would have lost the energy and the revenues that the water could have produced. No one would have benefitted from such economic waste. In contrast, the sale of energy by BPA to replace the power from the Trojan reactor produced revenues that helped BPA meet its obligations to the United States Treasury, and potentially reduced the rate burden on BPA's other customers.

At the time of the shutdown, BPA was engaged in ratemaking proceedings that would build into its rate structure a permanent provision for this type of situation. But without interim action, millions of dollars in revenue would have been lost and millions of dollars worth of nuclear fuel wasted before those new rates went into effect. Quite naturally, then, BPA sought

---

1. The Federal Energy Regulatory Commission, which has responsibility for approving BPA's rate determinations, also is of the opinion that BPA was not required to undertake ratemaking proceedings or seek approval from FERC before entering into the challenged transactions. *See* Brief *amicus curiae* for Federal Energy Regulatory Commission. FERC, however, bases its conclusion on different grounds than those we rely on.

to work out a short-term arrangement that would avoid waste and preserve revenues until the new rates went into effect. The shutdown arrangements lasted for only three months, and were terminated before the new rates went into effect.

Finally, and most importantly, the challenged transactions did not cause any harm to any of BPA's customers, including the California utilities that are of particular concern to CEC. The transactions affected only the two utilities that voluntarily participated in them. During and after the Trojan shutdown, BPA power continued to be available to all of BPA's customers at the rates, and according to the availability provisions, established in full ratemaking proceedings.

In general, CEC accepts these conclusions. Its concern is that BPA's action may set a precedent for future impromptu rate revisions that may affect California. CEC's fear is unfounded for two reasons. First, our decision in this case does not constitute a general approval of impromptu rate modifications by BPA. Our decision is based on the particular and unusual circumstances of this case. While we cannot say that circumstances justifying similar action by BPA will never recur, we do not expect such rate modification action will become a regular feature of BPA's operations. Statutory ratemaking procedures will remain the primary mechanism for modifications of BPA's rates. Second, our decision in this case relies on the fact that PGE and PP & L voluntarily participated in the transactions. A unilateral modification, even one that prevented economic waste, would stand on entirely different ground.

Judgment for Respondent.

NORRIS, Circuit Judge, dissenting:

I dissent for the reasons stated in my dissenting opinion in the companion case of *Portland General Electric Co. v. Johnson,* 754 F.2d 1475 (9th Cir.1985).