PORTLAND GENERAL ELECTRIC COMPANY, Petitioner,

v.

Peter JOHNSON, Administrator of the Bonneville Power Administration, Respondent,

Intalco Aluminum Corporation, et al., Intervenors.

No. 83-7546.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 3, 1984.

Submission Withdrawn July 11, 1984.

Resubmitted Oct. 1, 1984.

Decided March 4, 1985.

William A. Norris, Circuit Judge, dissented and filed opinion.

Alvin Alexanderson, Alvin L. Alexanderson, Portland, Or., for petitioner.

John Cameron, Asst. Gen. Counsel, Bonneville Power Admin., Portland, Or., for respondent.

Harry Poth, Robert T. Hall, III, Reid & Priest, New York City, Charles H. Turner, U.S. Atty., Jack G. Collins, Chief, Civil Div., Portland, Or., for intervenors.

Before KILKENNY, SNEED, and NORRIS, Circuit Judges.

SNEED, Circuit Judge:

Petitioner Portland General Electric Company (PGE) challenges reduced-rate sales of electric power by the Bonneville Power Administration (BPA) to BPA's direct service industrial customers that took place in 1983.[1] Petitioner alleges that BPA failed to follow ratemaking procedures mandated by the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (1982).

We find that petitioner had standing to bring this action, that the action is timely, and that the petitioner is not barred from bringing this action by failure to raise its objections before the agency. On the merits, we find that under the circumstances of this case BPA was not required to follow ratemaking procedures.

## I.

### STATEMENT OF THE CASE

A. *Background*

Respondent BPA is a federal government agency that markets power from federal

---

1. PGE was the beneficiary of a transaction, undertaken by BPA at approximately the same time, that raises issues similar to those raised by the sales that PGE challenges in this case. *See* *California Energy Resources Conservation and Dev. Comm'n v. Bonneville Power Admin.,* 754 F.2d 1470 (9th Cir.1985).

hydroelectric projects and other federally-owned sources of electric power in the Pacific Northwest. BPA's operations and statutory mandate are discussed in detail in *Central Lincoln Peoples' Util. Dist. v. Johnson*, 686 F.2d 708 (9th Cir.1982), *rev'd sub nom. Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.*, —— U.S. ——, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984), and *Central Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101 (9th Cir. 1984). We present here only the essential facts necessary to understand this case.

BPA sells power to public utilities and other public entities, to private, investor-owned utilities, and to direct service industrial customers (DSI's). The public and private utilities purchase power for resale to consumers. The DSI's, primarily aluminum manufacturers, purchase power directly for their own use.

Petitioner Portland General Electric Company (PGE) and intervenors Intalco Aluminum Corporation (Intalco), Martin Marietta Aluminum, Inc., (Martin Marietta) and Pennwalt Corporation (Pennwalt) are all BPA customers. PGE is an investor-owned utility. Intalco, Martin Marietta, and Pennwalt are DSI's; they have intervened on the side of respondent BPA.

The Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (1982) (hereinafter referred to as the Regional Act), requires BPA to fix rates for electric power that are sufficient both to meet BPA's costs and to recoup the federal investment in its facilities "over a reasonable number of years." 16 U.S.C. § 839e(a). The Act prescribes procedures for establishing or revising rates. The required procedures include publication of notice of proposed rates in the Federal Register, public hearings, and decision on the record. *See* 16 U.S.C. § 839e(i). New rates must be approved by the Federal Energy Regulatory Commission (FERC) before they become effective. *Id.* § 839e(a)(2). Rate determinations and other final agency actions are subject to judicial review in this court. *See id.* § 839f(e).

A fundamental fact necessary to an understanding of this case is that the amount of power that BPA has to sell at any given moment depends on stream flows in the Columbia River basin. These streamflows cannot be predicted with precision. Therefore, BPA sells power under two different basic types of contracts. "Firm" power is sold under long-term contracts. The amount of firm power sold is within the amount that BPA expects to have available under even the most adverse streamflow conditions. "Nonfirm" power is sold on a short-term basis when available power exceeds BPA's firm commitments.

BPA's contracts with its DSI customers fall into a special third category. The DSI's receive their power under twenty-year contracts, and in that sense their power is "firm." Unlike utilities that serve residential customers, however, the DSI's can tolerate unexpected interruptions of their power. Therefore, part of the power that BPA sells to the DSI's serves as a reserve which BPA may call on in the event that an emergency threatens its ability to serve its other firm customers. *See* 16 U.S.C. §§ 839a(17), 839c(d)(1)(A); *Aluminum Co. of America*, —— U.S. at ——, 104 S.Ct. at 2481. The "interruptible" nature of BPA's service to the DSI's places that service in an intermediate category between firm and nonfirm. The Regional Act requires that the rates that BPA charges the DSI's be adjusted to reflect the interruptible nature of the service that the DSI's receive. *See id.* § 839e(c)(3).

B. *The Transactions at Issue*

At the beginning of 1983, BPA found itself with a projected surplus of marketable electric power for the coming year, and with projected revenues insufficient to meet its costs. Abnormally high stream flows were filling BPA's reservoirs to capacity, but demand was less than previously forecast, due to a general downturn in the national and regional economies.

Sales of both firm and nonfirm power were less than projected. In addition to the general decrease in demand caused by

the economic recession, the same high stream flows that were filling BPA's reservoirs were also filling the reservoirs of public utilities that had hydroelectric facilities of their own, thus further decreasing their need for BPA power. Further, BPA's sales to utilities in the Southwest were only a small fraction of what BPA had projected. Finally, because of a slack demand for aluminum, most of the DSI's had cut back their operations and were purchasing only about one-half of the power available to them under their long-term contracts with BPA.

According to BPA's forecasts, if additional sales could not be arranged, its hydroelectric facilities would be in a "spill condition" through much of 1983. That is, water would have to be spilled over dams, without generating electric power, in order to maintain reservoirs at safe levels for flood-control purposes. At the same time, projected shortfalls in revenues would require BPA to defer interest and amortization payments to the United States Treasury.

The rates in effect at the time had been established in a ratemaking proceeding during the spring and summer of 1982, and had gone into effect under temporary FERC approval on October 1, 1982. *See* 20 F.E.R.C. ¶ 61, 359 (1982). BPA's DSI customers, under rate schedule "IP–2," were paying approximately 2.6 cents per kilowatt-hour for power purchased under their long-term contracts. At the same time, nonfirm power was available for short-term purchase by other customers, under schedule "NF–2," at approximately 1.1 cents per kilowatt-hour.

BPA concluded that it could increase its revenues, and stimulate the regional economy, by making power available to the DSI's at the lower, nonfirm (NF–2) rate for purchases in excess of their current demand. If, as anticipated, the availability of reduced-rate power induced the DSI's to restart idle production lines, then badly-needed jobs would be created and BPA would profit from the sale of energy that would otherwise be wasted. Accordingly,

BPA issued on March 9, 1983, and published in the Federal Register on March 15, 1983, a "Notice of Availability and Request for Comments" proposing a sale of energy to the DSI's at NF–2 rates. *See* 48 Fed. Reg. 10,903 (1983). The notice invited public comments "by phone or mail through March 21, 1983." BPA received comments from thirty-four parties, including citizen's organizations, state and local government officials, members of Congress, utilities, and DSI customers.

Two of the DSI's, intervenors Intalco and Martin Marietta, objected to the terms of the proposed offer on the grounds that it unfairly favored their competitors. Unlike most of the other northwestern aluminum producers, Intalco and Martin Marietta had not substantially curtailed their operations in response to the decline in demand for aluminum. At the time, Intalco was operating at approximately 98% of capacity, and Martin Marietta was operating at approximately 91% of capacity. Because they were already operating so near their capacities, the proposed offer, which made power available at the NF–2 rate only for purchases in excess of current consumption, was of little benefit to them. They therefore argued that the offer unfairly favored DSI's that were currently operating below capacity, and penalized those, like themselves, who had maintained operations near capacity through the recession. Because the cost of electric power is such a large part of the cost of producing aluminum, the inequality in electric rates threatened to give the below-capacity group a significant competitive advantage over the near-capacity group. Intalco and Martin-Marietta argued that such effective price discrimination violated the Regional Acts' mandate that BPA "equitably allocate ... all costs and benefits ... including ... the sale of or inability to sell excess electric power." 16 U.S.C. § 839e(g) (1982).

Responding to these objections, BPA incorporated into the proposed sales contracts a "mitigation factor" that allowed DSI's that were already operating near capacity to substitute nonfirm energy at the

NF–2 rate for a part of the power that they were already consuming at the higher IP–2 rate. Under the mitigation formula, the amount of power that those customers were permitted to purchase at the NF–2 rate depended on the amount of power that the other DSI's purchased at that rate. The formula was designed to achieve rough equity among the DSI's, and was constructed such that, no matter how much power was purchased by the DSI's at the NF–2 rate, BPA's losses from the substitution of the NF–2 rate for the IP–2 rate for existing sales would always be exceeded by the increased revenues from new sales. In other words, the formula guaranteed BPA a net profit on the nonfirm sales. In this way BPA sought to improve the economic position of both itself and that of the DSI's, as well as the general economy of the area, by utilizing power that otherwise would have been wasted.

In response to comments BPA also incorporated a "price of aluminum adjustment" into the proposed offer. That adjustment made the amount of power available to the DSI's at the NF–2 rate dependent on the current price of aluminum. When that price reached a level that would make full-capacity production feasible without reduced-rate power, all DSI's would pay the IP–2 rate for all of their power.

BPA sent out draft contracts incorporating the "mitigation factor" and the price-of-aluminum adjustment to all of its customers, including the plaintiff PGE, on March 11, 1983, and made its formal offer on March 22, 1983. The DSI's were given until April 8 to accept the offer, and the contracts were to be effective through October 31, 1983. Nine of the fifteen DSI's accepted the offer. Of the nine, three—Martin Marietta, Intalco, and Pennwalt—benefitted from the mitigation factor.

On April 26, 1983, BPA issued a "Notice of Final Action" announcing the sales. That notice was published in the Federal Register on May 5, 1983. *See* 48 Fed.Reg. 20275 (1983).

BPA's revenues from its DSI customers for the period April—October 1983 exceed-ed its earlier forecasts for that period by approximately $31 million. Administrative Record at 2–3. BPA attributes the increased revenues to sales under the March offer. Although the "mitigation factor" permitted the three affected companies to pay a reduced rate for some power that they had already been purchasing, even BPA's revenues from those three companies increased, by approximately $2.4 million, because the companies also increased the amount of power that they purchased. *Id.* at 3.

## C. *PGE's Objections*

Plaintiff PGE objects to the March offer on the grounds that the offer constitutes ratemaking without adherence to the statutory ratemaking procedures. PGE argues that, by offering power to the DSI's at the NF–2 rate, which rate was previously unavailable to them, BPA effectively changed the DSI rate that is contained in schedule IP–2. PGE claims that the use of the NF–2 rate and the label "nonfirm" for the sales was merely a device to manipulate the DSI price.

PGE focuses its attack on the mitigation factor, contending that it did not stimulate any new sales of energy but simply lowered the rate for energy that certain customers were already purchasing under their long-term contracts. PGE claims that the substitution of nonfirm energy at the NF–2 rate for firm energy at the IP–2 rate is contrary to the availability provision of the NF–2 rate schedule, which provides that "[t]his schedule is not available for the purchase of energy which BPA has a firm obligation to supply."

PGE alleges that it and other customers are harmed by BPA's lowering of the DSI rate because BPA is under a statutory mandate to meet its costs and therefore any losses from the challenged transactions must ultimately be reflected in higher rates charged to PGE and other customers. PGE asserts that even if BPA's profits from increased sales under the March offer exceeded its losses caused by the "mitigation factor," BPA was still left in a worse

position than it would have been in had it not established the "mitigation factor." Thus PGE asserts that it and others in a similar position were made worse off by the "mitigation factor" even if all the short run benefits BPA anticipated were realized.[2]

BPA responds that it was not creating a new rate, but simply exercising its power to enter into contracts under the existing rates. BPA argues that its contracting authority allows it to determine how much of each type of service will be sold to each customer, and that it was acting within that authority when it contracted to sell some nonfirm service to the DSI's at the NF–2 rate in addition to what the DSI's were currently purchasing at the IP–2 rate and when, through the "mitigation factor," it contracted to substitute nonfirm service at the NF–2 rate for some of the power that Martin-Marietta, Intalco, and Pennwalt had already been purchasing at the IP–2 rate. Figuratively put, BPA claims it sells apples and oranges at different prices and that when it fills one market basket with eight apples and four oranges, rather than six of each, it has changed the price of neither. Only the total price of the basket has been changed.

BPA also alleges that PGE lacks standing to bring this action, that the action is barred by the Regional Act's statute of limitations, and the PGE is barred from bringing this action because it failed to raise its objections before the agency.

We will address these threshold issues before turning to the merits of the case.

## II.

### STANDING

To have standing to bring this action, PGE must allege that it has suffered injury-in-fact from the transactions that it challenges. *See Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556

(1984); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). PGE, as already indicated, alleges that it was injured by the mitigation formula because, under that formula, some DSI's paid less for electric power than they would have absent the formula. PGE alleges that, because BPA is under a statutory mandate to recover its costs through revenues from power sales, revenues lost through the mitigation formula will ultimately be reflected in higher rates charged to PGE and other BPA customers.

Because our disposition of the merits of PGE's claim involves the question of whether the challenged transactions had any deleterious effect on any of BPA's customers, the standing issue is closely intertwined with the merits. For purposes of standing, however, we accept as true PGE's allegation of injury and we find that the alleged financial injury is sufficient to establish PGE's standing.

We also find that PGE's standing is supported more generally by its status as a BPA customer. The BPA's statutory ratemaking procedures are designed to permit its customers to participate in the formulation of its rates. PGE has been a party to all of BPA's ratemaking proceedings, including the one that established the rates that were in effect at the time of the challenged transactions. PGE's right as a customer to participate in ratemaking proceedings could be rendered meaningless if PGE did not also have standing to challenge a failure by BPA to undertake such proceedings.

## III.

### TIMELINESS

A. *The Ninety Day Issue*

The Regional Act provides that any suit challenging an action or decision by the

---

**2.** In its original petition, PGE sought a declaratory judgment that the sales in question were unlawful, and an injunction requiring BPA to bill the DSI's that benefitted from the "mitigation factor" for all money that they had saved as a result of that factor. PGE has now modified its request for relief, and seeks a declaratory judgment and a remand to BPA with directions to conduct a ratemaking hearing.

BPA "shall be filed within ninety days of the time that such action or decision is deemed final, or, if notice of the action is required by [the Act] to be published in the Federal Register, within ninety days from such notice, or be barred." 16 U.S.C. § 839f(e)(5) (1982). The Act requires that when BPA engages in ratemaking, notice of proposed rates be published in the Federal Register. *See id.* §§ 839e(i)(1), 839e(i)(4).

 For purposes of determining whether this action is timely, we assume the validity of PGE's claim on the merits. If PGE's assertion that BPA was engaged in ratemaking is correct, then BPA was required to publish a notice of its proposed new rate schedules in the Federal Register. Although BPA did publish an initial notice in the Federal Register on March 15, the first appearance in the Federal Register of the mitigation provision that PGE challenges was in the "Final Action" notice that BPA published on May 5. This action was filed on July 25, 1983, within ninety days of the May 5 notice. We therefore find that this action is timely.

### B. *The Failure to Object Issue*

BPA claims that this action is barred by PGE's failure to raise its objections during the public comment period that extended from the mailing of the draft contracts, on March 11, 1983, until March 21, 1983. PGE claims that it did raise its objections orally in a meeting between its counsel and counsel for BPA. *See* Brief for Petitioner at 9 & n. 5; Reply Brief for Petitioner at 16–17 & n. 10. BPA claims to be unaware of any such oral objections. *See* Brief for Respondent at 19.

The "Notice of Availability and Request for Comments" that BPA issued on March 9 invited comments "by phone or mail through March 21, 1983." 48 Fed.Reg. 10903, 10903. Exigent circumstances may have justified the shortness of the comment period, and that shortness may have in turn justified the invitation to accept oral comments, but the existence and content of such comments are clearly difficult if not impossible to verify. We believe we should accept as true, for the limited purpose of determining whether this action is barred, PGE's allegation that it did in fact orally present its objections to the agency. To do otherwise would permit the resolution by an appellate court of a disputed question of fact, an undertaking for which we are not equipped, to bar review on the merits.

 In any event, the record shows that the objection that BPA failed to engage in statutory ratemaking proceedings was clearly and prominently raised in a written comment from the Public Power Council that BPA received on March 21, 1983. *See* Administrative Record at 721–24. There is therefore no doubt that this objection was before the agency, and we therefore conclude that this action is not barred.

### IV.

### THE MERITS

When BPA offers to sell power to a class of customers at a rate unavailable to that class under the established rate structure, it has modified the rate structure and generally must follow statutorily-prescribed ratemaking procedures. BPA's rates are not an interchangeable set of prices among which it is free to choose in any particular sale of energy; each rate is, by its own terms, available only to certain customers under certain conditions. *See* Administrative Record at 434 (Schedule NF–2); *id.* at 436 (Schedule IP–2). A change in the availability provisions of the rate schedules constitutes ratemaking. Therefore, under normal circumstances, to return to the figure we have employed, the price of the market basket cannot be changed by applying the apple price to oranges or vice versa. Ordinarily this is ratemaking.

We believe that this is what BPA accomplished in its March 1983 action. The availability provision of the NF–2 nonfirm energy rate schedule provides that that schedule "is not available for the purchase of energy which BPA has a firm obligation to supply." *See* Administrative Record at 434. Thus, the substitution of nonfirm en-

ergy at the NF–2 rate for power that BPA was obligated to supply under its long-term contracts with the DSI's appears to be inconsistent with the rate schedule, and therefore would ordinarily require modification of the rate schedule through the statutory ratemaking procedures.

■ While we recognize the analytic soundness of this approach, we are unwilling to brand every such action by BPA as requiring compliance with the ratemaking procedures of the Regional Act and approval by FERC. Nor does FERC. *See* Brief Amicus Curiae of Federal Energy Regulatory Commission. A certain latitude must be allowed within which BPA can exercise a degree of business judgment with respect to temporary situations. We are neither prepared to, nor need we, establish the precise limits of this latitude. We need address only the facts of this case. We find that under the unusual circumstances of this case, BPA was justified in acting without strict compliance with ratemaking procedures. Those circumstances required BPA "to mold its procedures to the exigencies of the particular case." *Gulf States Utils. Co. v. Federal Power Comm'n,* 411 U.S. 747, 762, 93 S.Ct. 1870, 1879–80, 36 L.Ed.2d 635 (1973). In reaching this conclusion, we are influenced by the extraordinary conditions that led BPA to undertake the challenged transactions, by the need for prompt action by BPA, by the short-term, interim nature of the transactions, by the fact that BPA did solicit, accept, and consider public comment on its proposed action, and especially by the fact that the transactions benefitted all of BPA's customers while harming none.

At the time that BPA made its offer to sell nonfirm energy to the DSI's, it was faced with the distinct possibility that it would soon have to spill water over its dams and thereby forego the sale of the energy that that water could produce. No one would benefit from such waste. If that energy could be sold, however, even at a rate lower than BPA normally charged the DSI's, it would produce revenues that could help BPA meet its obligations to the United States Treasury, and potentially lead to a future reduction in rates to all of BPA's customers. Moreover, if the energy were sold at a rate low enough to induce the restarting of idle industrial capacity, unemployed workers could be rehired and the ailing economy of the Pacific Northwest would receive a needed boost. Given these circumstances, it was in the interest of all parties that BPA enter into the challenged transactions.

The terms of BPA's offer were tailored to match the circumstances and to increase BPA's revenues and stimulate production without giving the DSI's a windfall. Except for the adjustments required by the mitigation factor, the nonfirm rate was available only for purchases in excess of the DSI's previous consumption. Moreover, the price-of-aluminum adjustment ensured that the DSI's would revert to paying full price for all of their power as soon as full production without reduced-rate power was economically feasible.

We repeat, it was essential that BPA act quickly. On January 28, 1983, BPA had published a notice of its intention to begin a new ratemaking proceeding to revise its rates. *See* 47 Fed.Reg. 4027 (1983). The proposed new rate schedule, which was issued on March 28, 1983, *see* 47 Fed.Reg. 12,766 (1983), included a provision for special sales to DSI's at reduced rates designed to stimulate the regional economy in times of energy surplus. The new rates could not be implemented until the completion of the lengthy ratemaking procedure, however, and were therefore not scheduled to take effect until November 1, 1983. BPA's March offer was effective only until the new rates were scheduled to go into effect. It was a short-term measure designed to prevent irretrievable losses of energy and revenue pending the completion of the new ratemaking proceedings.

Although BPA did not invoke ratemaking proceedings, it did make public its proposed offer to the DSI's, and it did accept and consider comments from interested parties, government officials, and members of the public. The record contains thirty-

four sets of comments received by BPA between March 10 and March 21, 1983, *see* Administrative Record at 663–745, as well as a breakdown of those comments by issues, *see id.* at 641–662. Most of the comments in the record are written; the rest are summaries of telephone comments. The comments are from public and private utility companies (including petitioner PGE), DSI's, city and county governments, chambers of commerce, citizens' organizations, and individuals. The record also contains three letters from U.S. Senators and Congressman and BPA's responses to those letters.

The most important factor justifying our result is that no party suffered any harm as a result of the nonfirm sales. The obvious purpose of the statutory requirement for a ratemaking hearing is to provide interested parties an opportunity to participate in the determination of rates and availability provisions that affect them. The transactions challenged in this case, however, had no direct effect on any of BPA's customers except those DSI's that voluntarily entered into them. During and after the nonfirm sales, BPA power continued to be available to all of BPA's customers, including the petitioner, at the rates, and according to the availability provisions, established in the prior ratemaking proceedings.

PGE contends, as already noted, that the mitigation formula will eventually result in higher rates charged to PGE and other BPA customers. This argument does not alter our result for two reasons.

First, PGE's rates cannot be increased except through a ratemaking proceeding in which PGE will have a full opportunity to participate. By refusing to condemn a consensual arrangement that, in an emergency, temporarily lowered the rate that BPA charged to one group of customers, we do not suggest that BPA could lawfully *increase* its charges to any customer without the consent of that customer and without statutory ratemaking proceedings. If PGE's rates are increased (or not decreased) in the next ratemaking proceeding as a re-

sult of any loss that BPA might have suffered in the challenged transactions, PGE will have a full opportunity to challenge such increase (or failure to decrease).

Second, the evidence in the record indicates that the challenged transactions resulted in a net increase in BPA revenues. The reduction in revenues caused by the mitigation formula was substantially outweighed by the increased revenues from additional sales. Thus, insofar as the transactions had an indirect effect on PGE and other BPA customers not parties to the transactions, that effect was benign.

Finally, PGE objects to the "netting" of BPA's gains and losses from the challenged transactions, and argues that the mitigation formula, which it challenges, should be considered separately from the additional sales of nonfirm energy, which it does not challenge. We disagree. The mitigation formula was part and parcel of the nonfirm sales. BPA reasonably concluded that it could not offer reduced-rate energy to DSI's that had curtailed their operations without also making a similar offer to those firms that had maintained their levels of production. An offer that benefitted only the former group would have unfairly placed the latter group at a severe competitive disadvantage, and would have arguably violated section 7(g) of the Regional Act, which requires BPA to "equitably allocate ... all costs and benefits .... including ... the sale of or inability to sell excess electric power." 16 U.S.C. §§ 839e(g) (1982).

The mitigation formula, moreover, ensured that any losses from the substitution of the NF–2 rate for the IP–2 rate would be exceeded by new revenues from increased sales. Under the formula, the amount of power that the intervenors were permitted to purchase at the NF–2 rate depended on the amount of new nonfirm power purchased by the other DSI customers. If the other DSI's did not increase their consumption of BPA power, the intervenors would not receive any power at the NF–2 rate.

In view of all these circumstances we conclude that ratemaking procedures were not required in this case.

We do not suggest, however, that impromptu action should become a regular feature of BPA's operations. The statutory ratemaking procedure must be the primary means for modifying BPA's rates and the availability provisions that apply to those rates. If short-term, emergency variations in rates and availability are required, provision for such emergency variations in the future should be built into the rate structure that is developed in ratemaking hearings and approved by FERC.

Judgment for Respondent.

NORRIS, Circuit Judge, dissenting:

Congress has carefully circumscribed the statutory authority of the Bonneville Power Administration ("BPA") to sell hydroelectric power in the Pacific Northwest by requiring BPA to follow detailed procedures in establishing rates. 16 U.S.C. § 839e(i). In this case it is undisputed that BPA sold surplus hydroelectric power to aluminum manufacturers, referred to as direct service industrial customers ("DSI's"), at rates not established in conformity with the statutory procedures.

Portland General Electric Company ("PGE") challenges the sales to the DSI's because the statutory ratemaking procedures were not followed. The majority excuses BPA's failure to conform to the statutory ratemaking procedures because of what the majority considers to be the "unusual circumstances" of the case.

Thus, the majority carves out an "unusual circumstances" exception to the absolute statutory command that "in establishing rates ... the Administrator shall use the following procedures ..." 16 U.S.C. 839e(i).[1] I submit that the majority's statutory exception is created out of whole judicial cloth. It finds no support either in the statutory language or legislative history. Indeed, Judge Sneed cites no language in the statute that he relies upon, nor does he cite any legislative history to support his "unusual circumstances" exception. The consequence of this judicially fashioned exception is to confer upon the BPA undefined discretion to bypass the statutory ratemaking procedures whenever it considers it expedient to do so. The only check on the BPA's discretion is review by this court under the majority's vague "unusual circumstances" standard.

In this case, the majority has determined that "unusual circumstances" justified the sales to the DSI's at rates not adopted pursuant to the ratemaking procedures because of a substantial surplus of power created by a combination of abnormally high stream flows and reduced demand for power resulting from a recession. The majority reasons that under these circumstances, BPA's decision to sell nonfirm energy to DSI's without following the ratemaking procedures appears to have made good economic sense.

On the face of it, the majority's reasoning is seductive. There is considerable appeal in the argument that by selling the nonfirm energy to DSI's at bargain rates the BPA would succeed in both reducing the surplus of hydroelectric power and stimulating the depressed economy of the Pacific Northwest by inducing aluminum companies to increase production. The Congress, however, has not given this court the authority to ratify sales of power by

---

1. Judge Sneed, in interpreting the statute to create an "unusual circumstances" exception, does not rely upon the rule that a statutory interpretation made by an administrator of an agency is entitled to special deference. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* — U.S. —, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). This lack of deference is not surprising because Judge Sneed's theory was not advanced by any of the party's involved in this appeal. BPA simply argued that the statutory ratemaking procedures were inapplicable because the sales to the DSI's did not involve ratemaking. Curiously, the Federal Energy Regulatory Commission ("FERC"), in its amicus brief, argues still a different theory for validating the sales: The transactions should not be subject to ratemaking procedures because they were changes in rate schedules rather than in the rates. Brief Amicus Curiae of FERC at 6.

BPA in contravention of the statutory rate-making procedures on the basis of our judgment that the sales made good business sense under the circumstances. Moreover, if this court is to review BPA's business judgment as though we were a board of directors reviewing management decisions, we should have an evidentiary record before us. Here there is nothing except BPA's word that it thought the sale of power to DSI's seemed to be a good idea. There is no testimony. There are no documents. There are no opinions of experts agreeing or disagreeing with BPA. For all we know from this record, the disputed sales were nothing more than a windfall to the aluminum companies at the expense of other BPA customers such as PGE. For all we know, the twin goals of disposing of surplus power and stimulating the economy of the Pacific Northwest would have been achieved more effectively and equitably if the surplus power had been offered at reduced rates to all BPA customers, not just the DSI's. The point is that the majority's opinion that the sales to the DSI's made good economic sense is based on nothing but surmise.

I believe that we are remiss in starting down the road of reviewing BPA power sales under a vague "unusual circumstances" exception to the clear and unequivocal congressional command that BPA must follow prescribed ratemaking procedures in selling power. Whether BPA should have greater flexibility in ratemaking is a question that should be decided by the Congress, not this court. Indeed, Congress has created at least one exception to the ratemaking procedural requirements by giving BPA the flexibility to sell power outside the United States at negotiated rates above rates established in ratemaking procedures for nonfirm power sold domestically. 16 U.S.C. § 839e(1). Perhaps BPA should have similar flexibility when confronted with an exceptional surplus of power such as existed in the spring of 1983. But once again, that is for Congress, not this court to decide.