Kevin BELL; James H. Weaver; Lloyd K. Marbet; Utility Reform Project, Petitioners,

Alcoa Inc., Intervenor,

v.

BONNEVILLE POWER ADMINISTRATION, Respondent,

Goldendale Aluminum, and Northwest Aluminum Company, Inc.; Columbia Falls Aluminum Company, Respondent–Intervenor.

Kevin Bell; James H. Weaver; Lloyd K. Marbet; Utility Reform Project, Petitioners,

Alcoa Inc., Intervenor,

v.

Bonneville Power Administration,
Respondent,

Columbia Falls Aluminum Company,
Inc.; Golden Northwest Aluminum,
Inc., Respondent–Intervenor.

Nos. 01–70616, 01–71369.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 2003.

Filed Aug. 21, 2003.

Daniel W. Meek, Portland, OR, for the petitioners.

David J. Adler, Special Asst. U.S. Attorney and Thomas C. Lee, Asst. U.S. Attorney (appearing only), Portland, OR, for the respondent.

Paul M. Murphy, Murphy & Buchal, Portland, OR, for the joint intervenor-respondents.

William H. Walters, Miller Nash LLP, Portland, OR, for the nonaligned intervenor.

Before LAY,* WALLACE, and TALLMAN, Circuit Judges.

WALLACE, Senior Circuit Judge.

In these consolidated actions, Petitioners Utility Reform Project and its members Bell, Weaver, and Marbet (collectively, Bell) seek review of power sale contract amendments between Bonneville Power Administration (BPA) and several direct service industries. Except as otherwise explained, we have jurisdiction over Bell's timely filed petition under 16 U.S.C. § 839f(e). We deny the petitions for review.

## I.

BPA is a federal agency designated as the marketing authority for almost all electric power generated in federal facilities in the Pacific Northwest. 16 U.S.C. § 838f. In furtherance of this mandate, BPA entered numerous contracts to supply power at a designated rate to direct service industries (DSIs), industrial companies engaged in power intensive operations. While the DSI had the option to curtail the amount of power it was obligated to buy, the original contracts gave BPA no authority to curtail the amount of power it was obligated to sell.

A subsequent energy crisis created a low power supply and high prices in the spot market, where BPA ultimately buys its power. The price of the power to BPA skyrocketed, but the price of power to DSIs remained at the low contract rates. The result was a financial disaster: a contractual obligation to buy high and sell low. In response, BPA developed a load reduction program: conservation by consumers, reduction in power demand by utilities, and load curtailment by DSIs. BPA accomplished the load curtailment program by paying the DSIs to agree to amend the contracts so that BPA would be excused from its contractual obligations to supply power to the DSIs at the contract rate. The plan was an astounding success.

Bell challenges these curtailment amendments, contending that (1) BPA exceeded its statutory authority, (2) BPA's decision was arbitrary, capricious, and unsupported by substantial evidence, (3) BPA failed to comply with the ratemaking procedures of 16 U.S.C. § 839e(i), (4) BPA violated the resource acquisition provisions of 16 U.S.C. § 839d(c)(1), and (5) BPA violated the National Environmental Policy Act (NEPA) by not complementing the curtailment amendments with environmental analyses and environmental impact statements.

■ Our power of review is limited. We may set aside BPA's decision only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2); 16 U.S.C. § 839f(e)(2) (directing courts to apply section 706 to BPA's actions). We must uphold BPA's reasonable interpretation of its statute. Ass'n of Public Agency Customers v. Bonneville Power Admin., 126 F.3d 1158, 1169 (9th Cir.1997) (APAC).

At least one curtailment amendment has been fully performed as of April 1, 2003. Nonetheless, Bell's challenge is live because it is capable of repetition, yet evading review. Cal. Energy Res. Conservation & Dev. Comm'n v. Bonneville Power Admin., 754 F.2d 1470, 1473 (9th Cir.1985) (rejecting a similar mootness argument by BPA).

■ Bell seeks review of the amendment to contract number 01PB–10786. Notwithstanding Bell's assertions to the

* Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

contrary, this agreement was executed in February, 2001. The petition for review was filed six months later, far beyond the Northwest Power Act's ninety-day time limitation. 16 U.S.C. § 839f(e)(5). We therefore lack jurisdiction to review contract number 01PB–10786.

## II.

■ Bell argues that BPA exceeded its statutory authority by executing the curtailment amendments. Conceding that BPA has statutory delegation to buy and sell power, 16 U.S.C. § 832a(f), Bell argues that BPA lacks statutory authority to pay customers to curtail power purchases. But the administrator has explicit statutory direction to amend contracts "upon such terms and conditions and in such manner as he may deem necessary." 16 U.S.C. § 832a(f); *accord* 16 U.S.C. § 839f(a). The curtailment agreements, as amendments of contracts to buy and sell power, are clearly within the administrator's authority.

## III.

■ Bell next argues that BPA's decision was arbitrary and capricious because the DSIs would "likely" have shut down or independently curtailed their power purchases even absent the curtailment amendments. Bell's guess is his business risk assessment that the curtailment provisions were unnecessary. Few contracts entail no business risk. BPA's decision to amend its contract obligations was eminently businesslike, given the probably devastating result of performing the original contract, the significant risk that the DSIs would not independently curtail their power purchases, and the program's smashing success. We will not second-guess the wisdom of BPA's winning business decisions, especially when it was responding to unprecedented market changes. *See APAC,* 126 F.3d at 1171 (also refusing to second-guess BPA's business decisions under a

more searching standard of review). The decision was not arbitrary or capricious.

## IV.

■ Bell also argues that the curtailment amendments essentially created a discount by lowering the original contract price for power. *See Bonneville Power Admin. Proc.* § 1010.2(j), 51 Fed. Reg. 7611–01, 7615 (1986) (defining "rate" as including "discount"); *APAC,* 126 F.3d at 1176–77 (upholding BPA's definition of "rate"). Bell argues that the ratemaking procedures of the Regional Act § 7(i), 16 U.S.C. § 839e(i), applied but were not satisfied.

Bell urges that the curtailment amendments were roundabout discounts because the money paid to the DSIs was inextricably linked with the rate so as to modify the original price. We have not yet accepted this "inextricably linked" theory since BPA's 1986 definition of "rate." *See Cal. Energy,* 754 F.2d at 1474 (blessing the "inextricably linked" theory, but decided before BPA's definition of "rate"); *APAC,* 126 F.3d at 1177–78 ("While this general proposition ['inextricably linked' theory] *may* be true, it is not applicable in this case") (emphasis added). As in *APAC,* we have no occasion to reach the validity of the theory here because the curtailment amendments were not inextricably linked with the original contract's ratemaking provisions for three reasons.

First, the transactions were separate in time. The curtailment agreements were executed seven or eight months after the original sale contract. Second, the transactions were separate in environment. The power market landscape changed dramatically during the interim months.

Third, and most important, the transactions were separate in consideration. If the contract amendment was a discount, we would expect that BPA gets too little or nothing in return for the money it gives to

the DSIs (besides the previous sale of power). For instance, in *California Energy*, we concluded that BPA made a roundabout discount when it bought worthless scheduling rights. 754 F.2d at 1474. Here, however, BPA is getting something very valuable in return: curtailed power.

Similarly, in *APAC*, we examined curtailment provisions that permitted DSIs to reduce power purchases if the DSI paid BPA a fee. 126 F.3d at 1178–79 (analyzing section 18(a) curtailment provisions). We held this was not a rate because the DSI did not receive power in consideration for the fee. *Id.* Admittedly, this case is different from *APAC* in that the curtailment agreements here permit BPA, rather than the DSI, to reduce power purchases for a fee. This case asks whether the curtailment fee produces a discount, whereas in *APAC*, the case asked whether the curtailment fee produced a rate increase. Yet the ultimate conclusion still holds; the fee for the curtailment is not for the "sale of electric power or transmission services and is therefore not a rate." *Id.* at 1178.

We do not hold that separability in time, environment, and consideration are necessary to demonstrate the nonexistence of a rate. We also do not hold that other considerations are irrelevant. We merely hold that, on the particular facts before us, BPA's curtailment agreements were not rates subject to the ratemaking procedures of the Regional Act. We therefore need not decide whether BPA's failure to comply with the ratemaking procedures was excusable under *California Energy*, 754 F.2d at 1474.

## V.

■ For each proposal to acquire a major resource, the Regional Act requires the administrator to publish notice, conduct a public hearing, develop a record, and make a public written decision. 16 U.S.C. § 839d(c)(1). Bell concedes that BPA's amended contract with Alcoa Inc. did not violate the resource acquisition provisions. However, Bell maintains that BPA violated the resource acquisition provisions in its amended contract with Golden Northwest Aluminum, Inc., which states:

> BPA's resource development support for Golden Northwest and its affiliates will be limited to providing the means to facilitate new wind resources. Such support will be negotiated between BPA and GNA to be consistent with detailed principles established by BPA, limited to 200 MW of wind for a 10–year term, and conditioned on any resource being fully permitted and priced comparably with BPA's spring 2001 wind RFP project results.

Bell also relies on the Administrator's press release that BPA "will support development of a wind energy project."

Bell's challenge is not ripe for review. There can be no violation of section 839d now because BPA has not yet acquired a resource. It made only future plans to negotiate and support. *See Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 447 (9th Cir.1989) (section 839d is triggered only if BPA owns part of the resource); *Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1463–66 (9th Cir.1986) (challenge to contract provisions that BPA has not yet implemented is not ripe for review).

■ Bell finally argues that BPA violated NEPA by not conducting environmental analyses and creating environmental impact statements for its curtailment amendments. We cannot consider these claims unless Bell demonstrates standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (rejecting the doctrine of hypothetical jurisdiction to reach the more readily resolvable merits).

To establish standing in NEPA cases, Bell must show (1) injury in fact within NEPA's zone of interests, (2) causation, and (3) redressability. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir.2001). The critical issue here is whether Bell has demonstrated causation.

In NEPA cases, causation requirements are relaxed but still a constitutional necessity; Bell must show a "reasonable probability" that the alleged injury is caused by the challenged action. *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1016 (9th Cir.2003); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1113 (9th Cir.2002); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (causation is a constitutional standing requirement in similar Endangered Species Act claim). However, Bell has not shown to a reasonable probability that any petitioner's enjoyment of the land will be lessened by the lack of environmental analysis, i.e., Bell has not shown causation. Though neither party addressed causation in their briefs, we must satisfy ourselves of standing, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), as causation is a constitutional requirement to Article III standing. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir.2002).

The direct effect of the curtailment amendments is not an environmental injury but a reduction in the amount of power BPA supplies to the DSIs. For the agreement to cause the environmental damage Bell alleges, we must conclude that Bell has shown, to a reasonable probability, that the curtailment agreements keep the DSIs in business (an inference BPA contests), and that the DSIs will injure the environment. Because Bell's standing depends on the action of the DSIs, Bell must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressibility of injury." *Defenders of Wildlife*, 504 U.S. at 562, 112 S.Ct. 2130; *Pub. Citizen*, 316 F.3d at 1017 (applying the requirement to a NEPA claim).

Bell failed to provide facts necessary to show causation, despite the relaxed causation standards for NEPA claims. Bell presents press releases and statements by BPA's Administrator that the high cost of *wholesale* power would likely have forced the companies to shut down. This statement is largely beside the point because the original contracts protected DSIs from the wholesale rate. Bell challenges the contract amendments, not the underlying contracts, and our causation analysis must be duly focused on the precise claim asserted. The question is whether the DSIs would have stayed in business with the original contract rates and absent the contract amendments. On this, Bell gives no facts that demonstrate causation. To the contrary, the DSIs were empowered to curtail their power purchases at the contract rates independently of BPA's preferences and even before the challenged curtailment agreements. Bell also does not demonstrate that the DSIs would be unable to purchase power from other power providers. Bell speculates that, absent the additional sum the BPA pays the DSIs to escape its contractual obligation, the DSIs would have shut down. Bell gives no facts, figures, or data. Such speculation is inadequate under the Supreme Court teachings in *Defenders of Wildlife*.

Bell argues that the curtailment amendments drain funds needed to meet BPA's environmental responsibilities. If anything, the curtailment agreements enabled BPA to save money, furthering its environmental efforts. Again, causation is lacking.

Finally, Bell urges that he has standing under *APAC*, 126 F.3d at 1183 n. 9 ("Utili-

ty Reform Project and Kevin Bell also raise NEPA claims and it is uncontested that these parties have standing."). But *APAC* does not help Bell. First, such "drive-by jurisdictional rulings" are not precedential. *Steel Co.*, 523 U.S. at 91, 118 S.Ct. 1003. Second, *APAC* did not consider a NEPA challenge to the curtailment agreements at issue here, and thus it did not face the above described causation problems.

## VI.

## VII.

We deny Bell's petitions for review. We dismiss as moot BPA's motion to strike the declaration of Bell's counsel and portions of the reply brief. We dismiss Bell's challenge in case number 01–70616 as waived.

PETITION DENIED.