813 F.2d 1364
 The CITY OF SEATTLE, City Light Department; City of Eugene,
by the Eugene Water & Electric Board; Public Utility
District No. 1 of Chelan County, Washington; City of
Tacoma; Public Utility District No. 1 of Grant County,
Washington; Central Lincoln Peoples' Utility District;
Clatskanie Peoples' Utility District; and Tillamook
Peoples' Utility District, Petitioners,
v.
Peter JOHNSON, as Administrator, Bonneville Power
Administration; Donald P. Hodel, as Secretary of
the Department of Energy; and the
United States of America, Respondents,
and
Hanna Nickel Smelting Company, et al., Intervenors.
PUGET SOUND POWER & LIGHT COMPANY, Petitioner,
v.
Peter JOHNSON, as Administrator, Bonneville Power
Administration; Donald P. Hodel, as Secretary of
the Department of Energy; and the
United States of America, Respondents.
 Nos. 83-7947, 84-7591.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 4, 1985.
Decided April 1, 1987.
 
 Alan S. Larsen, Jay Waldron, Portland, Or., John Daniel Ballach, Seattle, Washington, Walter L. Williams, Seattle, Wash., for petitioner.
 David J. Adler, Thomas C. Lee, Portland, Or., John A. Cameron, Portland, Or., for respondents.
 Petition for Review of a Nonfinal Rate Proposal of the Bonneville Power Administration.
 Before KENNEDY and REINHARDT, Circuit Judges, and PRICE,* District Judge.
 PER CURIAM:
 
 
 1
 In these consolidated appeals, the Public Generating Pool (PGP)[1] and the Puget Sound Power & Light Company (Puget Sound) seek a review of a portion of the wholesale power rates established by the Bonneville Power Administration (BPA) in 1983. PGP and Puget Sound allege that BPA's imposition of a fixed charge for the right to receive power, independent of whether PGP and Puget Sound actually use any power, violates their contract with BPA. They also contend that the charge violates the Pacific Northwest Electric Power Planning and Conservation Act (the Regional Act), 16 U.S.C. Secs. 839-839h (1982), because BPA acted in excess of its statutory authority.
 
 
 2
 One of the principal provisions of the Regional Act directed BPA to offer new long term contracts for power sales to various classes of its customers. Id. Sec. 839c(g)(1) (1982). Both petitioners entered into a contract with BPA in August of 1982. The contracts govern nearly every facet of the relationship between BPA and petitioners except the rate structure. Under the Regional Act, BPA must conduct rate-making proceedings to establish rates for the sale, disposition, and transmission of electric power and capacity. Id. After extensive notice, hearings, and comments, the statutory scheme requires BPA to file the rates with the Federal Energy Regulatory Commission (FERC) for final confirmation and approval. See id. Secs. 839e(a)(2), (i), (k). FERC, however, usually grants interim approval so that the rates become effective immediately, subject to refunds if FERC ultimately rejects the rates. See id. Sec. 839e(i)(6).
 
 
 3
 By the terms of the Regional Act, petitioners are preference customers entitled to purchase firm power[2] at regional rates.[3] Because the petitioners are also generating utilities, possessing substantial power generation capacity, they are "computed requirements customers." Computed requirements customers formerly contracted with the BPA to purchase firm power, but they retained the right to use and sell their own firm and nonfirm power, as well as the right to purchase nonfirm power from any producer in the Pacific Northwest. Historically, this enabled petitioners to pay only for the power they received from BPA.
 
 
 4
 BPA became dissatisfied with this arrangement because of the costs associated with its duty to stand ready to deliver firm power to its customers in periods when the customers produced power of their own.[4] The BPA incorporated a charge to recover some of the fixed costs attributable to such standby duty, i.e. an availability charge. The effect of the availability charge, the petitioners argue, is to require the petitioners to pay for power they do not receive in periods when their needs for electrical power are being satisfied from other sources.
 
 
 5
 BPA issued its 1983 rate decision on September 29, 1983. This was submitted to FERC on October 3, 1983. In addition to final confirmation and approval, BPA sought waiver of the 90-day advance filing requirement and sought interim FERC approval. In response to the filing notice published in the Federal Register, numerous parties, including the petitioners, sought to intervene and contest the 1983 rates on various grounds. On October 26, 1983, FERC waived the 90-day advance filing requirement, in effect denying intervention. FERC determined that the rates could be implemented for a period of one year effective November 1, 1983, subject to refund and interest upon FERC's disapproval. On July 2, 1985, FERC issued its order approving and confirming the 1983 rates.
 
 
 6
 On December 15, 1983, PGP filed action No. 83-7947 naming both the BPA and the Department of Energy as defendants, complaining that the availability charge was a breach of contract. On May 4, 1984, BPA filed a motion to dismiss for lack of jurisdiction. On July 10, 1984, we denied BPA's motion and ordered the parties to address the jurisdictional issues in their briefs. On September 12, 1984, Puget Sound filed action No. 84-7591 in this court against BPA on substantially the same grounds as the PGP complaint. We ordered that the actions of PGP and Puget Sound be consolidated and that they be calendared for argument with the actions consolidated in Atlantic Richfield Co. v. Bonneville Power Admin., No. 83-7971 (9th Cir. argued Dec. 4, 1985).
 
 
 7
 The issue is whether we have jurisdiction to consider the petitions. 16 U.S.C. Sec. 839f(e)(1) provides that only "final actions" are subject to judicial review, and lists "final rate determinations" as being among these reviewable actions. 16 U.S.C. Sec. 839f(e)(4)(D) provides that rate determinations are final only upon confirmation by FERC. 16 U.S.C. Sec. 839f(e)(5) gives jurisdiction to courts of appeals to hear suits challenging these final actions. Thus, unless there was a final action as of the date the petition was filed, we do not have jurisdiction.
 
 
 8
 FERC did not approve the 1983 rates until several months after the last petition was filed. In Central Lincoln Peoples' Util. Dist. v. Johnson (Central Lincoln II), 735 F.2d 1101, 1108-10 (9th Cir.1984), we made it clear that petitioners may not challenge a rate until FERC passes judgment on the rate. See also Pub. Util. Comm'r of Oregon v. Bonneville Power Admin., 767 F.2d 622, 628 (9th Cir.1985) (challenges to BPA actions on constitutional grounds must await final FERC approval). In Central Lincoln II, however, all parties conceded that the challenge was to the rates as such. Thus if the petitioners' complaint is in essence a challenge to BPA's rate determination, Central Lincoln II, and the statutory framework, mandate that we dismiss the action.
 
 
 9
 Petitioners attempt to distinguish Central Lincoln II by arguing that the availability charge is not a rate at all. Rather, they contend it is a penalty or charge for not purchasing their full allotment of energy. This contention is incorrect. Rates are simply the charges BPA imposes on its customers for the provision of service. Rates for service may be structured in many ways besides a single unchanging amount for each kilowatt-hour of supplied energy. Rates may include per unit charges that change as the amount of energy supplied changes and charges that depend on capacity supplied, as well as charges that are determined by other factors. The Regional Act provides for such variation in its empowering of BPA to establish "rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power." 16 U.S.C. Sec. 839e(a)(1) (emphasis added). It expressly permits BPA to establish a variety of types of rates, including "a uniform rate or rates for sale of peaking capacity or ... time-of-day, seasonal rate, or other rate forms." Id. Sec. 839e(e). In short, the statute does not require BPA to impose any particular type of rate on its customers. Rather it restricts BPA only to "sound business principles" in setting rates to meet its revenue requirements. Id. Sec. 839e(a)(1). To limit the meaning of "rate" in the manner suggested by the petitioners would improperly limit the authority afforded FERC by the Act.[5]
 
 
 10
 Petitioners attempt to avoid the conclusion that the availability charge is a rate for supplied power by characterizing it as a charge for "non-power." In support, they point out that they must pay the charge regardless of the amount of power they purchase. This argument does not advance their cause. The availability charge is the minimum amount BPA is willing to accept from a customer in order to supply its energy needs. By incorporating it into the rate schedule, BPA has in effect established a high average rate per kilowatt-hour if very little energy is used and a lower average rate if more is used. Thus, the availability charge is not a charge for "non-power," but rather is a mechanism for varying the average rate for energy, depending on the amount used.
 
 
 11
 Next, petitioners argue that, even if the availability charge is a rate, FERC's review of rates is so limited that BPA's rates were final. They point out that the Regional Act provides for FERC approval of rates merely upon a finding that they are based on total system costs and are sufficient to repay the government's investment. Id. Sec. 839e(a)(2). While the statute requires FERC to make only limited findings in approving rates, we note that the scope of those required findings is commensurate with the mandate of the BPA in establishing rates. Cf. id. Sec. 839e(a)(1), (2). Thus, we do not find that the statute provides FERC so narrow a scope of review of BPA rates that those rates are essentially final even prior to FERC review. In any case, petitioners' view leads to a result that contradicts our holding in Central Lincoln II, i.e. that our review of a BPA rate must await FERC's review of that rate.
 
 
 12
 Finally, petitioners attempt to evade the jurisdictional bar by contending that their claim is not that BPA exceeded its ratemaking authority by imposing the availability charge but that BPA breached its contractual obligations to them. Because their claim is one for breach of contract, they argue, it is of no consequence that the charge is a rate. A careful reading of the contracts, however, indicates that the parties understood that the contracts were being entered into in light of BPA's obligation to review and publish rates periodically. It is equally clear that any rate changes would not be final until after confirmation and approval by FERC. Any alleged contract breach resulting from a change in rates would therefore not occur until after such action by FERC. Thus, casting the complaint in terms of a breach of contract does not avoid the jurisdictional bar.
 
 
 13
 Petitioners do not challenge any action taken by BPA other than the adoption of the availability charge as part of its 1983 wholesale power rates.
 
 
 14
 We therefore dismiss the petitions for want of jurisdiction.
 
 
 
 *
 Honorable Edward Dean Price, United States District Judge, Eastern District of California, sitting by designation
 
 
 [1]
 The Public Generating Pool is a group of publicly owned utilities in Oregon and Washington
 
 
 [2]
 Firm power is the amount of electrical energy that the generating utility must be prepared to supply to the purchasing distributor at all times, barring emergencies
 
 
 [3]
 Regional rates are the rates at which purchasers in the Pacific Northwest would be entitled to purchase power. Purchasers outside the Pacific Northwest could only purchase surplus energy or peaking surplus capacity at nonregional rates
 
 
 [4]
 Petitioners' capacity to produce power from their own generation sources varied greatly, depending upon the water supply available to them. The supply depended upon precipitation in the area
 
 
 [5]
 It is also possible that some BPA decisions, though not technically "rates," might be so entangled with the ratemaking process that we must await FERC review