831 F.2d 1467
 CALIFORNIA ENERGY RESOURCES CONSERVATION AND DEVELOPMENT
COMMISSION, Petitioner,
v.
BONNEVILLE POWER ADMINISTRATION; James J. Jura, as
Administrator*; and John S.
Herrington, as Secretary of the
Department of Energy of the
United States of
America,
Respondents.
PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, Petitioner,
v.
James J. JURA, as Administrator of the Bonneville Power
Administration*; John S. Herrington, as
Secretary of the Department of Energy of the United States
of America; and the United States of America, Respondents.
 Nos. 84-7836, 85-7430, 84-7838 and 85-7470.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 13, 1986.
Decided Nov. 6, 1987.
 
 William M. Chamberlain, Sacramento, Cal., for petitioners.
 Peter G. Fairchild, San Francisco, Cal., for Public Utilities Commission of the State of Cal.
 L. Randall Weisberg, Portland, Or., for Bonneville Power Admin.
 R. John Seibert, Department of Justice, Washington, D.C. (argued), for respondents.
 On Petition for Review of Action of the Bonneville Power Administration
 Before TANG, SCHROEDER and NORRIS, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 Introduction
 
 1
 These are consolidated petitions to review the Bonneville Power Administration's [BPA] interim access policy for the Pacific Northwest-Pacific Southwest Intertie, a system of high voltage lines transmitting federal and non-federal power from the Pacific Northwest to the Southwest. The petitioners are: (1) the California Public Utilities Commission (CPUC), a government entity responsible for insuring reasonable rates for the State's energy consumers, Cal.Pub.Util.Code Secs. 301-322, and (2) the California Energy Resources Conservation and Development Commission (CEC), a state agency that adopts energy policies, forecasts energy needs, and certifies construction of power plants in California, Cal. Pub. Res. Code Secs. 25200, 25216. The essence of their claim is that the access policy unlawfully excludes low cost energy generated in the Pacific Northwest and Canada from BPA's transmission lines and thus prevents that lower cost energy from reaching California electric power consumers.
 
 
 2
 This is the second challenge to the interim policy. In the first, we upheld it over the objections of the Los Angeles Department of Water and Power. Department of Water & Power of the City of Los Angeles v. Bonneville Power Admin., 759 F.2d 684 (9th Cir.1985). Several of the objections of these petitioners are similar to objections which we discussed in that case.
 
 
 3
 Before reaching the merits of petitioner's objections, however, we must first discuss a threshold jurisdictional question. The question is whether the policy can be considered final agency action that is now reviewable on the merits by this court, or whether the policy is in the nature of a rate that is not final, and therefore not yet subject to our review, until reviewed by the Federal Energy Regulatory Commission [FERC]. See 16 U.S.C. Secs. 839e(i), (k); Central Lincoln Peoples' Util. Dist. v. Johnson, 735 F.2d 1101, 1109 (9th Cir.1984). We conclude that we have jurisdiction to review because the policy is not a rate. On the merits, we find no basis for overturning the agency's actions, adopting the policy on a temporary interim basis pending implementation of a long term policy.
 
 Facts
 
 4
 In Department of Water & Power, this court recently set forth a description of BPA's operations and the provisions of the Intertie Access Policy. See 759 F.2d at 685-90. Because they are important to this case, we will again review the background facts.
 
 
 5
 BPA is a federal agency that markets hydroelectric power within the Pacific Northwest and oversees distribution of power from the Pacific Northwest to California and the Southwest desert. See 16 U.S.C. Sec. 832a. Its operations are governed in part by the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. Secs. 839-839h (the Regional Act). The Regional Act prescribes procedures for setting and modifying rates for the sale and transmission of energy, and requires FERC approval of rates. 16 U.S.C. Secs. 839e(i), 839e(k). It also requires BPA to establish rates that are sufficient to insure BPA's fiscal independence. 16 U.S.C. Sec. 839e(a)(1). BPA's operations are also governed by the Bonneville Project Act, 16 U.S.C. Secs. 832-832l, the Pacific Northwest Power Preference Act, 16 U.S.C. Secs. 837-837h, and the Federal Columbia River Transmission System Act, 16 U.S.C. Secs. 838-838k. See generally Blumm, The Northwest's Hydroelectric Heritage: Prologue to the Pacific Northwest Electric Power Planning and Conservation Act, 58 Wash.L.Rev. 175 (1983).
 
 
 6
 In the late 1960's, Congress established the Pacific Northwest-Pacific Southwest Intertie. 16 U.S.C. Secs. 838-838k. The purpose of the Intertie is to allow the Pacific Northwest and Pacific Southwest to exchange power when one region has a surplus supply and the other region has a heavy demand. BPA owns and operates most of the Intertie transmission lines above the Oregon-California border. A small group of California utilities owns the lines south of Oregon. See Department of Water & Power, 759 F.2d at 686.
 
 
 7
 On its lines, BPA transmits both federal "firm" and "nonfirm" power. Firm power is provided with the assurance of continued availability, and nonfirm power is provided only when supply exceeds firm power commitments. BPA also "wheels" non-federal firm and the less expensive nonfirm power for public and private utilities at established rates. See id. at 686. In selling its own firm and nonfirm power, BPA is statutorily required to give priority to purchasers within the Northwest, 16 U.S.C. Sec. 837a, and to public bodies and cooperatives, 16 U.S.C. 832c(a). Sales to purchasers outside the Northwest are limited to surplus energy, or energy "which would otherwise be wasted because of the lack of a market therefor in the Pacific Northwest at any established rate." 16 U.S.C. Secs. 837(c), (d) and 837a.
 
 
 8
 Because the Intertie has a limited transmission capacity, BPA must provide for allocation of Intertie capacity among competing power producers. In allocating Intertie capacity, BPA is statutorily required to give itself priority. 16 U.S.C. Sec. 837e. Any capacity in the Intertie "which is not required for the transmission of Federal energy ... shall be made available as a carrier for transmission of other electric energy." Id. Additionally, BPA "shall make available to all utilities on a fair and nondiscriminatory basis, any [excess] capacity in the Federal transmission system." 16 U.S.C. Sec. 838d.
 
 
 9
 Before adoption of the policies challenged here, BPA generally allowed access to the Intertie to be determined by the spot market. This meant that producers offering the most attractive prices at any given moment could make sales and obtain Intertie access until capacity was reached. On September 7, 1984, BPA promulgated an interim Near Term Intertie Access Policy to provide a more predictable mechanism for allocating Intertie capacity. 49 Fed.Reg. 44,232 (Nov. 5, 1984). The policy was adopted after a series of public hearings and publication of notices in the Federal Register. See 48 Fed.Reg. 33,515 (July 22, 1983); 49 Fed.Reg. 5,990 (Feb. 16, 1984); 49 Fed.Reg. 30,34 6 (July 30, 1984); 50 Fed.Reg. 19,781 (May 10, 1985). In 1985, the Los Angeles Department of Water and Power challenged the policy as an abuse of discretion and beyond BPA's statutory authority. This court upheld the policy. See Department of Water & Power, 759 F.2d at 695.
 
 
 10
 On June 1, 1985, BPA adopted a revised Near Term Intertie Access Policy. See 50 Fed.Reg. 26,827 (June 28, 1985). This policy is substantially identical to the interim policy. Both policies are challenged here and are referred to collectively as the Access Policy.
 
 
 11
 Under the Access Policy, assured transmission service is available for firm power sold by Pacific Northwest producers to California purchasers under BPA-approved sales contracts. Extraregional producers, including Canadian producers, cannot obtain assured service for firm power. Any capacity on the Intertie in excess of firm power needs is sold on an hourly or daily ("nonfirm") basis under one of three "conditions." Revised Near Term Intertie Access Policy, 50 Fed.Reg. at 26,830-31.
 
 
 12
 Condition One incorporates the Exportable Energy Agreement of 1969. This Agreement becomes operative only when river flows into Pacific Northwest dams are sufficiently high to threaten wasteful "spillover" conditions. Under this Agreement, BPA and each Northwest utility that declares a surplus of energy at BPA's "applicable rate" may sell and transmit a pro rata portion of its surplus to California purchasers. Non-regional producers, like Canadian utilities, may not use the Intertie when the Exportable Agreement takes effect. Id. at 26,831.
 
 
 13
 Condition Two becomes operative whenever BPA and Pacific Northwest utilities have enough surplus nonfirm energy to fill the Intertie at any price. Again, access to the Intertie is limited to BPA and Pacific Northwest producers. Each receives access to a pro rata portion of its declared surplus. Id.
 
 
 14
 Finally, under Condition Three, which becomes operative only when BPA and the Northwest utilities lack sufficient surplus to fill the Intertie at any price, extraregional utilities, including Canadian utilities, may gain access to the Intertie. Id.
 
 
 15
 Although the revised Near Term Intertie Access Policy was originally set to terminate on September 30, 1986, with the adoption of a long term policy, BPA extended the expiration date to June 30, 1987, to allow further evaluation of the long term policy. See 51 Fed.Reg. 23,819 (July 1, 1986). BPA has not yet adopted a long term policy, and the expiration of the interim policy has further been extended until June 30, 1988, or upon implementation of the long term policy, whichever occurs first. See 52 Fed.Reg. 9,530 (March 25, 1987).
 
 
 16
 Jurisdiction: Is the Policy a Rate?
 
 
 17
 CEC and CPUC argue here that BPA's adoption of the Access Policy constituted ratemaking and thus requires FERC approval before judicial review is available. The parties in Department of Water & Power did not raise this jurisdictional issue, and the court there did not address it. Since the question of jurisdiction was neither raised nor decided, this court's assumption of jurisdiction in Department of Water & Power does not establish controlling precedent on the appealability issue. See Matter of Baker, 693 F.2d 925, 925-26 (9th Cir.1982) (per curiam). Now that it is squarely presented, we must decide the issue.
 
 
 18
 The Regional Act requires BPA to set rates for electric power that are sufficient to cover costs and to recoup the federal investment in BPA's facilities "over a reasonable period of years." 16 U.S.C. Secs. 839e(a)(1), 832f, and 838g. The Act prescribes procedures for establishing and modifying rates. The procedures include notice in the Federal Register, public hearings with limited cross-examination, and decisions on the record. See id. Sec. 839e(i). FERC must approve rates before they become final and effective. Id. Sec. 839e(a)(2). For a brief historical discussion of federal power marketing agencies' ratemaking and review procedures, see United States v. Tex-La Elec. Co-op., 693 F.2d 392, 405-07 (5th Cir.1982).
 
 
 19
 Final rate determinations and other final agency actions are subject to original judicial review in this court. See 16 U.S.C. Sec. 839f(e); Public Util. Comm'n of the State of Calif. v. FERC, 814 F.2d 560, 561 (9th Cir.1987); California Energy Comm'n v. Johnson, 767 F.2d 631, 633 (9th Cir.1985); Central Lincoln Peoples' Util. Dist. v. Johnson, 735 F.2d 1101, 1108-09 (9th Cir.1984). On review, we must affirm the agency's action unless it is arbitrary, capricious, an abuse of discretion, or in excess of statutory authority. 16 U.S.C. Sec. 839f(e)(2); 5 U.S.C. Sec. 706; Department of Water & Power, 759 F.2d at 690. Additionally, BPA's interpretation of the Regional Act is to be given great weight and should be upheld if reasonable. Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984); California Energy Resources Conservation & Dev. Comm'n v. Johnson, 783 F.2d 858, 860 (9th Cir.1986), modified, 807 F.2d 1456, 1459 (1987).
 
 
 20
 This court's most recent discussions of BPA ratemaking are in Atlantic Richfield Co. v. Bonneville Power Admin., 818 F.2d 701 (9th Cir.1987) (per curiam), and City of Seattle v. Johnson, 813 F.2d 1364 (9th Cir.1987) (per curiam). In Atlantic Richfield, we held that a "customer charge" imposed by BPA as part of its overall charge for energy is a rate for the sale or disposition of power and is subject to FERC review. 818 F.2d at 705. Similarly, in City of Seattle, we held that an "availability charge" imposed on certain contract customers is also a rate. 813 F.2d at 1367. The availability charge is a fee designed to recover some fixed costs associated with BPA's duty under the contracts to stand ready to deliver energy when demanded. We expressly rejected the utilities' contention that the availability charge was a penalty for not purchasing energy, rather than a rate. We reasoned that so limiting the meaning of "rate" would improperly limit FERC's authority under the Regional Act to review BPA charges. Id.
 
 
 21
 Neither Atlantic Richfield nor City of Seattle is apposite to the facts presented here. As we noted in City of Seattle, "[r]ates are simply the charges BPA imposes on its customers for the provision of service." 813 F.2d at 1367; see also Black's Law Dictionary 1134 (5th ed. 1979) (defining "rate" when used in connection with public utilities as "price stated or fixed for some commodity or service ... measured by a specific unit or standard"). In its rules establishing procedures for reviewing rates of other power marketing agencies, FERC itself defines a rate as "the monetary charge or the formula for computing such a charge for any electric service." 10 C.F.R. Sec. 903.2(1).
 
 
 22
 The Access Policy, however, does not impose any charge at all or define any formula for computing charges. Nor does it give BPA authority to increase or decrease its own established charges for energy. Because it does not do so, FERC review of the Access Policy would not further the purposes of such review, which are first to insure that BPA's regional and nonregional rates are adequate and equitable, and second to insure that nonregional rates comply with BPA's organic statutes, see 16 U.S.C. Sec. 839e(a)(2) and (k); Central Lincoln Peoples' Util. Dist. v. Johnson, 735 F.2d 1101, 1110-13 (9th Cir.1984). FERC apparently agrees, for it has stated that the Access Policy is not ratemaking subject to its approval. See 33 FERC (CCH) p 61,235, at p. 61,486 (Dec. 12, 1985).
 
 
 23
 In support of their argument that adoption of the Access Policy constituted ratemaking, the petitioners here rely principally on Portland General Elec. Co. v. Johnson, 754 F.2d 1475 (9th Cir.1985). In that case, we held that BPA's offer to sell energy to one class of customers at a rate approved for another class was ratemaking. Id. at 1481. We explained that "BPA's rates are not an interchangeable set of prices among which it is free to choose in any particular sale of energy.... A change in the availability provisions of the rate schedules constitutes ratemaking." Id. Similarly, in a companion case to Portland General, we held that BPA engaged in ratemaking when it agreed to purchase several regional utilities' scheduling rights to a nuclear power plant, and that agreement was "inextricably linked" to BPA's agreement to sell those same utilities federal power as replacement. California Energy Resources Conservation & Dev. Comm'n v. Bonneville Power Admin., 754 F.2d 1470, 1474 (9th Cir.) (noting that "paying the buyer to buy is the same thing as reducing the price the buyer must pay"), cert. denied, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985). In both cases we concluded that agency action which had the effect of changing those schedules was ratemaking in nature.
 
 
 24
 Unlike the action in those cases, the BPA action challenged here does not conflict with the agency's existing rate schedules. The Access Policy is a formal statement of BPA's Intertie allocation policies. It does not make BPA energy available to purchasers at charges authorized for other purchasers or in any way attempt to avoid established rates. See Near Term Intertie Access Policy: Administrator's Record of Decision, at 11-16 (Sept. 1984) (Record of Decision I); Revised Near Term Intertie Access Policy: Administrator's Record of Decision, at 11 (May 1985) (Record of Decision II).[1] At most, by altering market forces the Access Policy can affect only the prices non-federal Pacific Northwest producers charge consumers. Yet the ratemaking provisions of 16 U.S.C. Sec. 839e apply only to the rates for federal energy and for the transmission of non-federal power. See 16 U.S.C. Sec. 839e(a).
 
 
 25
 Moreover, the parties have not pointed to any allocation provisions of established rate schedules with which the allocation policies challenged here are inconsistent. They probably cannot do so because federal power marketing agencies generally have not included resource allocation policies in rate schedules. FERC defines a rate schedule as a statement describing rates and charges for service, the type of services to which the rates and charges apply, and the classifications and other provisions which directly affect the rates and charges. 18 C.F.R. Sec. 300.1(7); 10 C.F.R. Sec. 903.2(n). This definition does not include resource allocation decisions which indirectly affect prices of non-federal energy. Rather, before the more recent adoption of formal policies through rulemaking, power allocation decisions of federal power marketing agencies have principally been made on an ad hoc basis by the exercise of the agencies' contracting authority. See Electricities of N. Carolina v. Southeastern Power Admin., 774 F.2d 1262, 1265 (4th Cir.1985); cf. City of Santa Clara v. Andrus, 572 F.2d 660, 673-74 (9th Cir.1978) (Secretary of Interior is not required to follow rulemaking procedures when disposing of federal hydroelectric power). Access has never historically been considered an aspect of rulemaking for before BPA adopted the Access Policy, it informally allowed access to the Intertie to be determined by the spot market. See Record of Decision I, at 39.
 
 
 26
 We consider the totality of the circumstances to determine if BPA action was ratemaking. See Portland General, 754 F.2d at 1481; California Energy Resources Conservation & Dev. Comm'n v. Bonneville Power Admin., 754 F.2d at 1474; see also City of Seattle, 813 F.2d at 1367 n. 5. Upon examination of all of these considerations, we conclude BPA's action, which followed the rulemaking procedures, did not amount to ratemaking requiring FERC review. We therefore have jurisdiction to review the Access Policy.
 
 The Merits
 
 27
 CEC and CPUC attack the Access Policy on essentially four grounds. Three of these grounds are discussed in Department of Water & Power. They are that the Access Policy lacks factual justification, that it is discriminatory in violation of 16 U.S.C. Secs. 837e and 838d, and that it fails to conform to federal antitrust policy. We deal with those issues first. We then turn to the remaining issue not discussed in our prior opinion, namely, that the policy excludes new generating sources in violation of 16 U.S.C. Sec. 839f(d) and 837e.
 
 A. Lack of Factual Justification
 
 28
 The petitioners argue that BPA's purported justifications for the policy lack a reasonable basis in fact and that BPA's action was therefore arbitrary, capricious, and an abuse of discretion.[2] In Department of Water & Power, however, this court specifically found that the interim Access Policy was factually justified. There, we stated that "BPA has presented reliable evidence that without a policy which carefully allocates Intertie access, it will experience significant revenue shortfalls in coming years. To the extent that the IAP [the Access Policy] is designed to mitigate projected deficits, therefore, the policy is not only statutorily authorized but statutorily mandated." Department of Water & Power, 759 F.2d at 693. As the petitioners concede, the interim policy and the revised policy are identical for these purposes. They point to nothing in the record of the revised proceedings that would require reexamination of their contention. Therefore, our earlier determination forecloses review here. See Royal Development Co. v. National Labor Relations Bd., 703 F.2d 363, 368 (9th Cir.1983). CEC's contention that Department of Water & Power should not control because the court there was unaware of BPA's huge net revenues and relied on conclusory evidence is merely an assertion that the case would have been decided differently on a different record. It does not provide a basis for disregarding the decision.
 
 B. Discrimination
 
 29
 CEC and CPUC contend that the Access Policy discriminates against extraregional utilities in violation of 16 U.S.C. Secs. 837e and 838d by denying them transmission access whenever a non-federal Pacific Northwest utility has unsold surplus available. Again, their challenge is foreclosed by Department of Water & Power. There, after specifically examining sections 837e and 838d, we stated that "BPA is required to allocate use of federally-owned transmission facilities in a manner which accords preference first to transmission of federal power and then to transmission of other Northwest-generated power." Department of Water & Power, 759 F.2d at 692-93, 695.
 
 C. Antitrust Arguments
 
 30
 The petitioners challenge the Access Policy as failing to conform to the maximum extent possible to the federal antitrust laws and policies. We held in the Department of Water & Power case that the anticompetitive effects there challenged were justified by fiscal concerns. Department of Water & Power, 759 F.2d at 693. In addition, we observed in a footnote that the antitrust laws were not applicable to BPA. Id. at 693 n. 12. We did not in that decision discuss to what extent BPA may be required to consider the policies of the antitrust laws, though we did stress the monopoly power which it had been given. Id. at 693.
 
 
 31
 BPA is required to consider some federal antitrust policies when providing for allocation of Intertie capacity. Congress specifically articulated its intent that BPA operate its transmission lines in part "to prevent the monopolization thereof by limited groups." 16 U.S.C. Sec. 832a(b).[3] This need to consider the interests of preserving competition, however, does not override BPA's statutory obligations, repeatedly expressed in 16 U.S.C. Secs. 832f, 838g, and 839e(a)(1), to be fiscally self-supporting.
 
 
 32
 The aspect of the policy which the petitioners attack here and which was not dealt with in our prior decision in Department of Water & Power is the pro rata allocation formula for surplus nonfirm energy. Under the Access Policy, firm energy needs are satisfied first and any remaining capacity is used for nonfirm energy. Under Conditions One and Two, Intertie capacity for surplus nonfirm energy is allocated daily or hourly among BPA and Pacific Northwest producers so that each receives a pro rata portion of its declared surplus. Under Condition Three, capacity for surplus nonfirm power is allocated among BPA, Northwest producers, and extraregional producers again based on a pro rata portion of each producer's declared surplus. Revised Near Term Intertie Access Policy, 50 Fed.Reg. at 26,830-31. The result is a regularly shifting, horizontal division of the market for surplus nonfirm energy; each eligible producer is temporarily granted sole access to a specified share of the capacity, which it may either use or allow to remain unused without fear of competition by other producers.
 
 
 33
 CEC and CPUC argue that this pro rata allocation formula is an abuse of discretion because it is anticompetitive and BPA's stated justifications could be achieved by a less anticompetitive alternative. They assert that BPA should be required to adopt a policy whereby it would first allocate to itself whatever capacity is needed to satisfy its revenue obligations, and then allow the remainder capacity to be filled by competitive, spot market transactions rather than by the pro rata formula.
 
 
 34
 The alternative which petitioners now propose was apparently not, however, directly raised during the notice and comment proceedings for the policy on review here. The agency did not evaluate it and we have no record on which to review the petitioner's contentions. See Kunaknana v. Clark, 742 F.2d 1145, 1149 (9th Cir.1984); see also Association of Data Processing Serv. Orgs. v. Board of Governors of the Fed. Reserve Sys., 745 F.2d 677, 684 (D.C.Cir.1984). During these interim phases of its action BPA and interested parties were concerned with the broader questions of its authority to allocate the Intertie as proposed.[4] In the circumstances presented here, where we deal only with a temporary policy, and administrative proceedings on a long term policy are ongoing, we should defer consideration of the alternative proposed by CEC and CPUC until the agency has been given an opportunity to analyze and act upon the alternative in its Long Term Policy.
 
 
 35
 We have reviewed the record to determine the reasonableness of BPA's evaluation of the alternatives it did have an opportunity to consider. There were two such alternatives, and both bear a close relationship to the alternative petitioners now propose.
 
 
 36
 One was that BPA reserve sufficient Intertie capacity for itself before providing any access to non-federal producers. The proponents of this alternative were concerned that BPA obtain the maximum revenues possible. See Record of Decision I, at 9. BPA rejected this proposal for the interim Near Term Policy because it believed that it could satisfy its revenue obligations without adopting such an extreme policy. The agency noted that the Access Policy's provisions for firm access would enable it to increase revenues by insuring that firm energy would be sold at firm energy rates. See id. at 9-11. It also believed that its role as a federal steward for transmission services would be best served by sharing the Intertie with Pacific Northwest producers. See id. The agency again rejected the alternative in its revised policy when its experience in recovering revenues under the initial Near Term Policy showed its revenue expectation to be justified. See Record of Decision II, at 18. Given these justifications and the experience under the initial policy, the agency's decision to reject this alternative in favor of the adopted allocation formula was rational. See Motor Vehicles, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).
 
 
 37
 Other parties expressed concern that the allocation formula was anticompetitive and recommended that BPA retain its practice of allowing spot market transactions to determine access to the Intertie for surplus nonfirm energy. See Record of Decision I, at 35-36. In response, BPA found that the monopsony power of California buyers prevented the market from being competitive even under the spot market practice and that the distressed prices stemming from the monopsony power resulted in BPA revenue shortfalls. See id. at 2, 40. It also found that a pro rata formula would help to equalize Intertie benefits between Pacific Northwest producers and California buyers of energy. See id. at 39-41. Finally, the agency remarked that the proposed policy was not as anticompetitive as the opponents asserted because it opened up a new market for firm energy and because other market forces still worked to encourage Pacific Northwest sellers to retain prices competitive with alternate forms of energy. See id. at 36-44. After several months experience with the interim policy, BPA reevaluated the anticompetitive effects in promulgating the revised policy. Based on data of non-federal prices provided by the parties, it found that although its revenues had increased as a result of firm energy sales over the Intertie, Pacific Northwest prices had not risen significantly. See Record of Decision II, at 1, 7-8. The agency explained that Pacific Northwest producers must still compete with other energy sources. See id. at 8. Also, the allocation mechanism results in overestimation of available Intertie capacity and, therefore, producers must remain price competitive to make sales. See id.
 
 
 38
 To counter concerns that the pro rata formula would result in unused Intertie capacity from higher prices, BPA initially proposed an economic override provision that would allow it to reduce the pro rata share of a non-federal producer if that producer's share would go unused because of its rates. See Record of Decision I, at 33-35. Almost all parties that commented on this provision, including both Pacific Northwest and California parties, objected to this provision as being too intrusive of the business practices of the parties. See id.; Record of Decision II, at 41-43. Given the widespread objection to what was intended to be a mitigation provision in favor of California energy buyers, BPA's rejection of the economic override alternative was reasonable.
 
 
 39
 On the basis of the record before us, we cannot say that the agency's interim decision to allocate the Intertie as undertaken in the Access Policy is arbitrary, capricious, or an abuse of discretion. Rather, the record shows that among the alternatives proposed and considered, BPA adopted what it reasonably believed would be a predictable, fair, and nondiscriminatory basis for allocating the Intertie while insuring adequate BPA revenues.
 
 D. Exclusion of New Generating Sources
 
 40
 With the exception of two specific sources, the Access Policy denies access for firm power to Pacific Northwest resources not operational on September 7, 1984. See Revised Near Term Intertie Access Policy, 50 Fed.Reg. at 26,828-29. CEC argues that this exclusion discriminates against utilities which develop new generating sources in violation of 16 U.S.C. Secs. 837e and 839f(d).[5] Because CEC represents California energy interests, it has standing to challenge the overall exclusion of new generating sources which may result in higher prices to California consumers. See California Energy Resources Conservation & Dev. Comm'n v. Johnson, 783 F.2d 858, 860 n. 2 (9th Cir.1986), modified, 807 F.2d 1456 (1987); California Energy Resources Conservation & Dev. Comm'n v. Bonneville Power Admin., 754 F.2d 1470, 1473 (9th Cir.), cert. denied, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985).
 
 
 41
 Section 9(d) of the Regional Act requires that in providing transmission access BPA not discriminate against a utility on the basis of independent development of resources. 16 U.S.C. Sec. 839f(d).[6] From this language CEC finds a statutory obligation to provide Intertie access to all new generating sources. Section 9(d), however, specifically states that the duty to provide nondiscriminatory service is "subject to ... any other obligations under existing law." Id. BPA points to two other obligations to justify its decision to exclude newly operational resources under the interim and revised Near Term policies.
 
 
 42
 The first is BPA's statutory obligation under the Regional Act to use its "authorities ... to protect, mitigate, and enhance fish and wildlife" in the Columbia River basin. 16 U.S.C. Sec. 839b(h)(10)(A); see Record of Decision I, at 82-85; see also Forelaws on Board v. Johnson, 743 F.2d 677, 682 (9th Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986).[7] During notice and comment proceedings, interested parties expressed concern that the policy "not enable or encourage resources which adversely affect anadromous fish." Record of Decision I, at 66. BPA was legitimately concerned lest its allocation policy encourage new development harmful to fish and wildlife.[8] By excluding new generating sources in its interim and revised Near Term policies, BPA could avoid encouraging harmful development while it evaluated less restrictive alternatives. BPA could also pursue its statutory obligation to be fiscally self-supporting while it developed an alternative.[9]
 
 
 43
 Additionally, under the National Environmental Policy Act [NEPA], 42 U.S.C. Secs. 4321-4361, BPA must prepare an environmental impact statement before undertaking any action that would significantly affect the quality of the environment. See Forelaws on Board v. Johnson, 743 F.2d 677, 681-82 (9th Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986). Because of the uncertain impact of the allocation policy on the environment, the agency reasonably concluded that it should exclude new generating sources in the interim and revised Near Term policies.
 
 
 44
 CEC nevertheless recites 16 U.S.C. Sec. 837e in support of its assertion that the exclusion provision exceeds statutory authority. That section provides that the Intertie "shall be made available as a carrier for transmission of [non-federal] electric energy." 16 U.S.C. Sec. 837e.[10] CEC argues that it mandates access to all new sources regardless of environmental impact. The legislative history of the subsequently enacted Regional Act makes clear, however, that environmental concerns are to be given a heightened priority and that the Regional Act "creates a new obligation on the region, the BPA, and other Federal agencies to protect, mitigate and enhance fish and wildlife." 126 Cong.Rec. 29809 (1980) (statement of chief sponsor Rep. Dingall), reprinted in United States Department of Energy, Legislative History of the Pacific Northwest Power Planning and Conservation Act 138 (1981); see 16 U.S.C. Sec. 839(6); see also 126 Cong.Rec. 27825 (1980) (statement of Rep. Bonker) ("The language in this bill--if interpreted according to the historical development and record of this legislation--will insure that power needs and fish needs are considered equally in the allocation of available water resources. That is the intent of Congress."), reprinted in Legislative History at 190. The Regional Act's focus on preservation and conservation modifies BPA's preexisting directives emphasizing widespread use of energy, sound business principles, and the lowest rates possible. See Blumm, The Northwest's Hydroelectric Heritage: Prologue to the Pacific Northwest Electric Power Planning and Conservation Act, 58 Wash.L.Rev. 175, 232-35 (1983).
 
 
 45
 We deal here with an interim ban. The petitioners do not point to any planned source which has yet been affected adversely. Although we do not purport to decide whether an absolute exclusion of new generating sources would be reasonable in a long term access policy, the present interim exclusion of new generating sources is not facially invalid.
 
 
 46
 The petitions are DENIED.
 
 NORRIS, Circuit Judge, dissenting:
 
 47
 I am troubled by Judge Schroeder's opinion in this obviously important case. While it may be that Department of Water and Power of the City of Los Angeles v. Bonneville Power Administration, 759 F.2d 684 (9th Cir.1985), forecloses appellants' claims that the BPA's Interim Access Policy arbitrarily favors the BPA itself and discriminates against Canadian utilities in violation of the statutory mandate,[1] that case does not foreclose a challenge to the BPA's policy of discriminating against Pacific Southwest utilities and energy consumers in favor of Pacific Northwest utilities.
 
 
 48
 The BPA's pro rata allocation scheme for available intertie capacity--a scheme which if implemented by a private party would plainly violate the antitrust laws--paternalistically restricts price competition among Northwest utilities and denies Southwest utilities and energy consumers the benefit of free market pricing for surplus energy offered for sale by privately-owned Northwest utilities. The interim access policy's interference with free market pricing simply creates a cartel for the Northwest utility companies in the sale of power to the Southwest.[2] The BPA's statutory mission, however, does not extend to acting as the guardian angel for Northwest utilities in their market relationship with Southwest utilities. If Northwest energy companies believe that the Southwest utilities are exercising some sort of unfair monopsony power, let them sue under the applicable antitrust laws. It is not the mission of the BPA to fight this battle for the Northwest utilities through the promulgation of a regionally biased access policy.
 
 
 49
 I can see no statutory authority under which the BPA is authorized to discriminate so clearly in favor of Northwest utilities and against Southwest utilities and energy users. Indeed, the relevant statutory language appears to point the other way. The anti-competitive, pro-Northwest utility slant of the pro rata intertie access plan seems plainly incompatible with the statutory language requiring that the BPA be "fair and non-discriminatory" in its treatment of all utilities, 16 U.S.C. Sec. 838d, as well as the clear understanding recognized in Department of Water & Power that the purpose of the intertie was to benefit both the Northwest and Southwest, 759 F.2d at 694.
 
 
 
 *
 James J. Jura, the current Administrator of the Bonneville Power Administration, is substituted for his predecessor in office pursuant to Fed.R.App.P. 43(c)(1)
 
 
 [1]
 To the extent that the petitioners argue that adoption of the Access Policy contemporaneously altered the rates that apply to nonfirm energy, they are incorrect. Although BPA previously used its "spill rate" as the "applicable rate" under the Exportable Energy Agreement, its decision to apply the "standard rate" instead is specifically anticipated by the applicable rate schedule NF-83. See 33 FERC (CCH) p 61,235, at p. 61,489. That schedule provides that nonfirm energy shall be sold at the standard rate, unless BPA "offer[s], at its discretion, to schedule Nonfirm Energy at the Spill Rate." By electing to exercise this discretion, BPA did not change any rates
 
 
 [2]
 BPA's justifications include:
 
 
 [1]
 to "assure[ ] that BPA has use of its portion of the Pacific Intertie as necessary for BPA's power marketing program";
 
 
 [2]
 to "enhance[ ] BPA's ability to recover revenue that otherwise would be lost if BPA failed to manage prudently its portion of the Pacific Intertie"; and
 
 
 [3]
 to "respond[ ] to the recent influx of requests for more space on the Pacific Intertie than there is available capacity."
 Near Term Intertie Access Policy, 49 Fed.Reg. at 44,233.
 
 
 [3]
 This statutory language is more specific than the Federal Power Commission's broad authority to issue public utility securities if "compatible with the public interest," an authority which the Supreme Court held to incorporate from other sections of the Federal Power Act an obligation to consider federal antitrust policies. See Gulf States Util. Co. v. Federal Power Comm'n, 411 U.S. 747, 756-59, 93 S.Ct. 1870, 1876-78, 36 L.Ed.2d 635 (1973); see also Otter Tail Power Co. v. United States, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973) (rather than insulate electric power companies from antitrust policies, the Federal Power Act intended to incorporate antitrust concerns)
 
 
 [4]
 In its Record of Decision for the revised policy, BPA specifically stated that it elected in the interim proceedings to focus on questions regarding its statutory authority to allocate the Intertie capacity because it had never adopted an allocation policy before. See Record of Decision II, at 3. In the wake of this court's decision in Department of Water & Power upholding the interim policy, BPA did not reanalyze all of its prior decisions. See id
 
 
 [5]
 CPUC does not raise a similar challenge
 
 
 [6]
 In full, section 9(d) provides:
 (d) Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer
 No restrictions contained in subsection (c) of this section shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i)(1)(B) and (i)(3) of this section and subject to:
 (1) any contractual obligations of the administrator,
 (2) any other obligations under existing law, and
 (3) the availability of capacity in the Federal transmission system,
 the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.
 16 U.S.C. Sec. 839f(d).
 
 
 [7]
 Section 4(h)(10)(A) provides:
 The Administrator shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of this chapter. Expenditures of the Administrator pursuant to this paragraph shall be in addition to, not in lieu of, other expenditures authorized or required from other entities under other agreements or provisions of law.
 16 U.S.C. Sec. 839b(h)(10)(A).
 
 
 [8]
 The Access Policy also restricts access by existing resources when it will result in a use of resources that adversely affects fish and wildlife. See Revised Near Term Intertie Access Policy, 50 Fed.Reg. at 26,829. CEC does not contend that BPA lacks authority to establish this condition for access
 
 
 [9]
 The Near Term Policy expressly indicates that the Long Term Policy will eliminate the total exclusion of new generating sources in favor of a less restrictive exclusion. As anticipated, the Long Term Policy will exclude new resources "if construction or operation of these resources will adversely impact fish and wildlife resources." See Revised Near Term Intertie Access Policy, 50 Fed.Reg. at 26,830 (emphasis added)
 
 
 [10]
 Sec. 837e. Transmission lines for other electric energy; rates
 Any capacity in Federal transmission lines connecting, either by themselves or with non-Federal lines, a generating plant in the Pacific Northwest or Canada with the other area or with any other area outside the Pacific Northwest, which is not required for the transmission of Federal energy or the energy described in section 837h of this title, shall be made available as a carrier for transmission of other electric energy between such areas. The transmission of other electric energy shall be at equitable rates determined by the Secretary, but such rates shall be subject to equitable adjustment at appropriate intervals not less frequently than once in every five years as agreed to by the parties. No contract for the transmission of non-Federal energy on a firm basis shall be affected by any increase, subsequent to the execution of such contact, in the requirements for transmission of Federal energy, the energy described in section 837h of this title, or other electric energy.
 16 U.S.C. Sec. 837e.
 
 
 [1]
 Parenthetically, it also seems to me that the panel in Department of Water & Power may have wrongly decided the Canadian issue. The exclusion of Canadian power, though arguably unobjectionable in its discrimination against Canadian producers, also discriminates against Southwest energy purchasers--intended beneficiaries of the intertie. That issue may be important enough to merit en banc consideration
 
 
 [2]
 To the extent that Northwest utilities are under no obligation to use their pro rata share of intertie access, the BPA's interim plan also acts as a restriction on output. Output restrictions, like restrictions on price competition, raise prices above the competitive market level. Thus, the interim access policy--suppressing both prices and output--is a double curse for Southwest utilities and energy consumers